## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CHRISTOPHER GRAHAM, and ELLEN RUSSO on Behalf of Themselves and All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>BMO HARRIS BANK, N.A., NATIONAL BANK OF CALIFORNIA, N.A., FIRST INTERNATIONAL BANK & TRUST, a North Dakota State-Chartered Bank, FIRST PREMIER BANK, a South Dakota State-Chartered Bank, MISSOURI BANK AND TRUST, a Missouri State-Chartered Bank, and NORTH AMERICAN BANKING COMPANY, a Minnesota State-Chartered Bank,<br><br>    Defendants. | **CIVIL ACTION NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT**<br><br>**JURY TRIAL DEMANDED**<br><br>DATED:  OCTOBER 4, 2013 |

Plaintiffs, Christopher Graham and Ellen Russo (collectively, "Plaintiffs"), individually and on behalf of the Class described below, by their attorneys, make the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiffs and their counsel, which are based on personal knowledge.

### NATURE OF THE ACTION

1.      Plaintiffs brings this class action against Defendants, BMO Harris Bank, N.A. ("BMO"), First International Bank & Trust ("First International"), First Premier Bank ("First

1

Premier"), National Bank of California ("NBC"), Missouri Bank and Trust ("MBT"), and North American Banking Company ("NABC") (collectively "Defendants") to recover damages and other relief available at law and in equity on behalf of himself, as well as on behalf of members of the class who have been injured by Defendants' participation in a scheme to access and utilize the Automated Clearing House ("ACH") network to collect unlawful debts, in violation of 18 U.S.C. § 1962 and the law of numerous states, including Connecticut.

2.      This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendants, arising from their participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.      Payday loans—small loans due in full on the borrower's next "payday"—have a long and sordid history.  For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable rates.  Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.      At least thirteen states across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap.  Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia (the "banned states"), and the District of Columbia.

5.      Certain payday lenders—many based offshore or purportedly on Indian reservations—make use of the Internet to circumvent these prohibitions and offer payday loans to consumers residing in these states while ignoring the laws prohibiting those very loans (the

"Out-Of-State Payday Lenders").  These loans ("Out-Of-State Payday Loans") feature interest rates of 400%, 500%, and higher.

6.      Out-Of-State Payday Lenders' ability to defy state law rests on the cooperation of financial institutions like Defendants that knowingly "originate" illicit payday loan debits and credits in the mainstream electronic payments system (the "Automatic Clearing House" or "ACH Network").  These banks, known as Originating Depository Financial Institutions ("ODFIs"), act as middlemen between illicit Out-Of-State Payday Lenders (many based offshore) and the mainstream electronic payments system.

7.      Indeed, it would be impossible for Out-Of-State Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in states where the loans are illegal and unenforceable without Defendants' willingness to allow the Out-Of-State Payday Lenders to access the ACH Network.

8.      BMO, First International, First Premier, NBC, MBT, and NABC, acting as ODFIs, actively participate in this unlawful scheme by working on behalf of Out-Of-State Payday Lenders to "originate" ACH entries that represent payday loan credits and debits to and from consumer checking accounts, thereby enforcing debts they know to be unlawful.

9.      Defendants know that they are crediting and debiting consumers' accounts for unlawful purposes because they know they are acting on behalf of Out-Of-State Payday Lenders and that the entries they originate on the ACH Network on behalf of such Out-Of-State Payday Lenders will credit or debit funds in states in which the Out-Of-State Payday Lenders' loans are illegal and unenforceable.  Defendants are required by federal banking regulations and the rules of the ACH Network to know the identities of the entities for which they originate transactions and to assure themselves that such transactions do not violate state or federal law.

3

10.     Defendants' illegal schemes with Out-Of-State Payday Lenders have victimized Plaintiffs and millions of others.  Unless enjoined, Defendants will continue to engage in these schemes and cause substantial injury to consumers.

## PARTIES

11.     Plaintiff Christopher Graham is a citizen and resident of Connecticut and resides in the Village of Moodus, Town of East Haddam, and County of Middlesex.

12.     Plaintiff Ellen Russo is a citizen and resident of Connecticut and resides in Bristol, Connecticut, County of Hartford.

13.     Defendant BMO is a national banking association incorporated in the State of Delaware with main offices at 111 West Monroe Street, Chicago, Illinois.

14.     Defendant First International is a North Dakota state-chartered bank with main offices at 100 North Main St., Watford, North Dakota.

15.     Defendant First Premier is a South Dakota state-chartered bank with main offices at 601 South Minnesota Avenue, Sioux Falls, South Dakota.

16.     Defendant NBC is a national banking association incorporated in the State of California with main offices at 12121 Wilshire Blvd., Los Angeles, California.

17.     Defendant MBT is a Missouri state-chartered bank with main offices at 1044 Main Street, Kansas City, Missouri.

18.     Defendant NABC is a Minnesota state-chartered bank with main offices at 2230 Albert Street Roseville, Minnesota.

## OTHER PERSONS AND ENTITIES

19.     The "Out-Of-State Payday Lenders" include, but are not limited to, the following:

a.      Spot On Loans ("Spot On") is an entity located in North Logan, Utah and maintains a website with an associated domain name of **www.spotonloans.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Spot On engaged in the practice of making and did make illegal payday loans by making such loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Spot On is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6), in that the loans that it makes and collects from borrowers are:

      i.   unenforceable because of state or federal laws against usury;

      ii.  incurred in connection with the business of lending money at an usurious rate; and

      iii. the usurious rate was at least twice the enforceable rate.

b.      Plain Green, LLC ("Plain Green") purports to be a tribal lending entity owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana and maintains a website with an associated domain name of **www.plaingreenloans.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Plain Green engaged in the practice of making and did make illegal payday loans by making such loans to persons residing in the banned states and the District of Columbia, where such loans are prohibited outright.  Plain Green is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6), in that the loans that it makes and collects from borrowers are:

      i.   unenforceable because of state or federal laws against usury;

      ii.  incurred in connection with the business of lending money at an usurious rate; and

      iii.  the usurious rate was at least twice the enforceable rate.

    c.     National Payday Loans ("National PDL") is an entity located Heredia, Costa Rica and maintains a website with an associated domain name of **www.nationalpayday.com** for the purpose of making illegal Out-Of-State Payday Loans. At all times relevant hereto, National PDL engaged in the practice of making and did make illegal payday loans by making such loans to persons residing in the banned states and the District of Columbia, where such loans are prohibited outright.  National PDL is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6), in that the loans that it makes and collects from borrowers are:

      i.  unenforceable because of state or federal laws against usury;

      ii.  incurred in connection with the business of lending money at an usurious rate; and

      iii.  the usurious rate was at least twice the enforceable rate.

    d.     Silver Cloud Financial ("Silver Cloud") purports to be a tribal lending entity owned by the Habematolel Pomo of Upper Lake, California and maintains a website with an associated domain name of **www.silvercloudfinancial.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Silver Cloud engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia, where such loans are prohibited outright. Silver Cloud is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6), in that the loans that it makes and collects from borrowers are:

6

       i.   unenforceable because of state or federal laws against usury;

      ii.   incurred in connection with the business of lending money at an usurious rate; and

     iii.   the usurious rate was at least twice the enforceable rate.

    e.      SFS, Inc. ("SFS") is an entity located in Niobrara, Nebraska and maintains a website with an IP Address of 38.98.28.88 with an associated domain name of **www.oneclickcash.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, SFS engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  SFS is in the business of making and collecting "unlawful debts" under 18 U.S.A. § 1961(6) in that the loans that it makes and collects from borrowers are:

       i.   unenforceable because of state or federal laws against usury;

      ii.   incurred in connection with the business of lending money at an usurious rate; and

     iii.   the usurious rate was at least twice the enforceable rate.

    f.      American Web Loan ("AWL") purports to be a tribal lending entity owned by the Otoe-Missouria Tribe of Indians and maintains a website with an associated domain name of **www.americanwebloan.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, AWL engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  ALW is in the business of making

and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

    i.  unenforceable because of state or federal laws against usury;

    ii.  incurred in connection with the business of lending money at an usurious rate; and

    iii.  the usurious rate was at least twice the enforceable rate.

   g.   Cash Cure, LLC ("Cash Cure") purports to be a limited liability company organized in Delaware with its principle place of business located at 901 North Market Street, Suite 700, Wilmington, Delaware and maintains a website with an IP Address of 207.200.13.171 with an associated domain name of **www.cashcure.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Cash Cure engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright. Cash Cure is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

    i.  unenforceable because of state or federal laws against usury;

    ii.  incurred in connection with the business of lending money at an usurious rate; and

    iii.  the usurious rate was at least twice the enforceable rate.

<u>**JURISDICTION AND VENUE**</u>

20.  Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d), which confers jurisdiction upon this Court over the subject matter of this action.  This Court also has subject matter jurisdiction over this action

8

pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

21. Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because this lawsuit has been brought as a class action, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and one or more of the members of the putative Class is a resident of a different state than Defendants.

22. This Court has personal jurisdiction over every Defendant pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

23. Alternatively, this Court also has personal jurisdiction over BMO pursuant to Conn. Gen. Stat. Ann. § 52-59b, in that BMO, personally or through an agent, committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

24. Alternatively, this Court has personal jurisdiction over First International pursuant to Conn. Gen. Stat. Ann. § 52-59b in that First International, personally or through an agent, committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

25.     Alternatively, this Court has personal jurisdiction over First Premier pursuant to Conn. Gen. Stat. Ann. § 52-59b in that First Premier, personally or through an agent, committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

26.     Alternatively, this Court also has personal jurisdiction over NBC in that NBC personally, or through an agent, committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

27.     Alternatively, this Court has personal jurisdiction over MBT in that MBT, personally or through an agent, committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

28.     Alternatively, this Court has personal jurisdiction over NABC in that NABC, personally or through an agent, committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

29.     Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here and

because BMO, First International, First Premier, NBC, MBT and NABC are subject to personal jurisdiction here.

## BACKGROUND FACTS
### Payday Loans

30.     A payday loan is a short-term (typically a matter of weeks), closed-end single payment loan.  A borrower obtaining a payday loan must either provide a personal check to the lender or an authorization to electronically debit the borrower's deposit account for the loan amount and associated fee as security for the loan.  If the borrower does not repay the loan or make arrangements to extend the loan, the lender can deposit the borrower's check or initiate an electronic withdrawal from the borrower's deposit account.

31.     Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.

32.     Payday loans feature exorbitant annual percentage rates (sometimes misleadingly referred to as "fees") and require "balloon" repayments shortly after the loan is made.

33.     If a borrower is unable to repay the full amount of the loan on the due date, the lender typically gives the borrower the option to "roll over" the loan balance by paying another "fee," usually equal to the initial fee at the time of loan funding.  The cycle then continues until such time as the borrower is either able to pay off the loan in full or the borrower defaults on the loan.

34.      Many borrowers repeatedly roll over or take out additional payday loans, often on the same day as a previous one is repaid.  Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.

35. For these and other reasons, Connecticut and twelve other states and the District of Columbia have outlawed payday loans.

36. In Connecticut, a transaction is civilly usurious when it imposes an annual interest rate exceeding 12% per annum. Conn. Gen. St. § 37-4. By statute, a usurious loan is void and unenforceable. Conn. Gen. St. § 37-8.

37. Out-Of-State Payday Lenders, while not permitted to operate in the banned states and the District of Columbia, have simply moved to the Internet in order to solicit desperate borrowers in the banned states and the District of Columbia into illegal loans using an online application process. This scheme could not have been accomplished without the complicity of Defendants, who provide Out-Of-State Payday Lenders with access to the ACH Network.

**The ACH Network**

38. The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing. Instead of using paper to carry necessary transaction information, such as with checks, ACH Network transactions are transmitted electronically, allowing for faster processing times and cost savings.

39. The ACH Network processes two types of transactions: Direct Deposits via ACH and Direct Payments via ACH. Direct Deposit via ACH is the deposit of funds for payroll, employee expense reimbursement, government benefits, tax and other refunds, and annuities and interest payments. It includes any ACH credit payment from a business or government to a consumer.

40. "Direct Payment" is the use of funds to make a payment via ACH. Individuals or organizations can make a Direct Payment via ACH as either an ACH credit or ACH debit. A Direct Payment processed as an ACH credit puts funds into an account. An example of this is

when a consumer initiates a payment through his/her bank or credit union to pay a utility bill.  A Direct Payment processed as an ACH debit takes funds from the customer's account and transfers those funds to the utility company's account.

41.     In 2012, the ACH Network processed more than 21 billion transactions with a total dollar value of $36.9 trillion.  In 2012, the ACH Network processed 9.79 billion ACH debit transactions and 6.96 billion ACH credit transactions.

42.     Rules and regulations that govern the ACH network are established by NACHA and the Federal Reserve.  NACHA manages the development, administration, and governance of the ACH Network.  BMO is a "Direct Financial Institution Members of NACHA" and influences the governance and direction of the ACH Network and the NACHA Operating Rules by participating in the NACHA Rule Making Process, voting directly on Rules ballots, and by participating in and leading NACHA Councils, committees, and initiatives. As a Direct Financial Institution Members of NACHA, BMO is eligible to serve on the NACHA Board of Directors and further shape regulatory, legislative, and ACH Network policies.

43.     An ACH transaction takes place in many steps.  First, an accountholder (called a "Receiver") authorizes a transaction with a merchant—the business or person providing a good or service.  That merchant (called an "Originator") then communicates the purported authorization to its ODFI.  The ODFI is a bank and a member of the ACH Network.  The ODFI then transmits the ACH debit or credit through the pass-through "ACH Operator" to the accountholder's bank, known as the Receiving Depository Financial Institution ("RDFI").  The RDFI is also a member of the ACH Network, and is the entity that actually makes the credit or debit on its customer's checking or savings account.

44.     There are also "Third Party Service Providers" which are entities   other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

45.     The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States.  These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

46.     The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants.  The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems. The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

47.     NACHA Rules also require specific responsibilities for ODFIs, as discussed below.

**ODFIs Have Special Duties Under NACHA
Operating Rules and Guidelines**

48.     NACHA characterizes ODFIs as "the gatekeepers of the ACH Network."  As the party that enables an Originator--such as Out-Of-State Payday Lenders--to initiate debit entries on the ACH Network, NACHA operating rules require an ODFI to enter into an Origination Agreement with each Originator for which it will originate entries on the ACH Network or have

an arrangement with a Third-Party Sender that has such an Origination Agreement.  NACHA

2012 Operating Rules, Section 2.2, Subsection 2.2.1.

49.     An ODFI undertakes critical responsibilities under the NACHA Rules that reflect

the reliance of the ACH Network on appropriate underwriting and monitoring of Originators by

ODFIs.

50.     Under the NACHA Rules, "[a]n ODFI is responsible for all Entries originated

through the ODFI whether by an Originator or through a Third-Party Sender  . . . [a]n ODFI is

responsible for its Originators' and Third-Party Senders' compliance with these Rules."

NACHA 2012 Operating Rules, Section 2.1.

51.     NACHA Rules require all ODFIs to conduct a risk assessment of their ACH

activities, including, *inter alia*, "assessing the nature of risks associated with ACH activity;

performing appropriate know-your-customer due diligence; and having adequate management,

information and reporting systems to monitor and mitigate risk."  *See* NACHA Operating

Guidelines, Chapter 4.

52.     The NACHA Operating Guidelines caution that "ODFIs that choose to originate

ACH entries . . . should be aware that both they and their Originators are subject to the NACHA

Operating Rules and applicable U.S. law when transmitting these entries."  NACHA 2012

Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

53.     When an ODFI transmits an ACH entry, it is warranting to each RDFI and ACH

Operator that, *inter alia,* the entry has been properly authorized.  NACHA 2012 Operating Rules

Section 2.4, Subsection 2.4.1.1 (a).

54.     With regard to debit entries from consumer accounts (such as those that represent

loan repayments to Out-Of-State Payday Lenders), an authorization that is "otherwise invalid

15

under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules.  NACHA 2012 Operating Rules Section 2.3, Subsection 2.3.2.3 (b).

55.     Further, Subsection 2.2.1.1-2 of the NACHA Rules require ODFIs to enter into a written agreement with every Third-Party Sender or Originator (or merchant) for whom they originate ACH entries.  That agreement is to include an "agree[ment] not to originate Entries that violate the laws of the United States;" a "restriction on the types of entries that may be originated" and must include "the right of the ODFI to audit the Originator's or Third-Party Sender's compliance with the Origination Agreement and these Rules."

56.     Further, ODFIs have clear duties to "know your customer" and the NACHA Operating Rules make clear that they are intended to reflect that principle.  NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

57.      On March 14, 2013, NACHA issued an advisory in response to certain negative press reports about collusion of ACH members with payday lenders.  In the release, NACHA reiterated the important policing duties of ODFIs:  "[E]ach ODFI is responsible for the valid authorization of every ACH debit processed in its name . . . In the case of authorizations from consumers, the NACHA Rules are explicit that, *inter alia*, the authorization must 'be readily identifiable as an authorization'; and 'have clear and readily understandable terms.'  **If a purported authorization is invalid under applicable law, it does not meet this standard**." (emphasis added).

58.     NACHA went on to say:  "Because of these obligations, as well as associated reputational and other risks, the Federal banking agencies advise that ODFIs, *inter alia*, should (i) exercise appropriate risk-based diligence when bringing on new Originators and Third Party Senders and (ii) perform appropriate monitoring to determine whether excessive returns or other

suspicious patterns of activity warrant further review or more aggressive action. For example, in 2006 the Office of the Comptroller of the Currency ("OCC") released its risk management guidance for ACH activities by national banks, OCC Bulletin 2006-39, in which it cautioned national banks acting as ODFIs to perform a risk-based evaluation of new Originators, including their historic patterns of unauthorized returns and whether they are engaged in legitimate business activities."

59.     The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

60.     In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Out-Of-State Payday Lenders or their Third-Party Senders could violate NACHA rules.  In the letter, NACHA stated that under its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

**The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into Payment Processor Relationships with Third Parties**

61.     The Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks.

62.     On February 25, 2005, the FDIC issued guidance regarding Payday Lending and cautioned that such lending raises "significant risks" for banks, particularly when the payday lenders originate through Third-Party Senders.  The FDIC guidance makes clear that:

> The use of third parties in no way diminishes the responsibility of the board of directors and management to ensure that the third-party activity is conducted in a safe and sound manner and in compliance with policies and applicable laws. Appropriate corrective actions, including enforcement actions, may be pursued for deficiencies related to a third-party relationship that pose concerns about either

> safety and [sic] soundness or the adequacy of protection afforded to
> consumers.

63.     On June 6, 2008, the FDIC issued additional "Guidance for Managing Third-Party

Risk," which began by noting that:

> An institution's board of directors and senior management are
> ultimately responsible for managing activities conducted through
> third-party relationships, and identifying and controlling the risks
> arising from such relationships, to the same extent as if the activity
> were handled within the institution.

64.     Among the risks to banks the FDIC identified in its June 6, 2008 "Guidance for

Managing Third-Party Risk" was:

> <u>Compliance risk.</u> Compliance risk is the risk arising from
> violations of laws, rules, or regulations, or from noncompliance
> with internal policies or procedures or with the institution's
> business standards. This risk exists when the products or activities
> of a third party are not consistent with governing laws, rules,
> regulations, policies, or ethical standards. For example, some third
> parties may engage in product marketing practices that are
> deceptive in violation of Section 5 of the Federal Trade
> Commission Act . . .Compliance risk is exacerbated when an
> institution has inadequate oversight, monitoring or audit functions.

65.     Accordingly, the FDIC advises banks to engage in "Due Diligence in Selecting a

Third Party":

> Following an assessment of risks and a decision to proceed with a
> plan to establish a third-party relationship, management must select
> a qualified entity to implement the activity or program. The due
> diligence process provides management with the information
> needed to address qualitative and quantitative aspects of potential
> third parties to determine if a relationship would help achieve the
> financial institution's strategic and financial goals and mitigate
> identified risks. Not only should due diligence be performed prior to
> selecting a third party, but it should also be performed periodically
> during the course of the relationship, particularly when considering
> a renewal of a contract.
>
> *****

Comprehensive due diligence involves a review of all available information about a potential third party, focusing on the entity's financial condition, its specific relevant experience, its knowledge of applicable laws and regulations, its reputation, and the scope and effectiveness of its operations and controls.

### The OCC Has Issued Guidance to All Banks On Managing the Risks of ACH Activity

66. The OCC supervises national banks.

67. On September 1, 2006, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."

68. The guidance advised:

High-Risk Activities

Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks. High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders.

69. In a footnote to the guidance, the OCC made the risks to banks even clearer, stating: "*[r]isks may include the risk of legal liability* or damage to an institution's reputation when *originators or third-party senders facilitate or engage in activities that violate criminal laws*." (Emphasis added.)

70.     On April 24, 2008, the OCC provided guidance for national banks and examiners

on managing the risks of ACH activity originated by Third-Party Processors, cautioning that:

> Banks should also consider carefully the legal, reputation, and other risks presented by relationships with processors including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. ***Banks that do not have the appropriate controls to address the risks in these relationships may be viewed as facilitating a processor's or its merchant client's fraud or other unlawful activity***. (Emphasis added.)

71.     The guidance reminded banks that they:

> . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.
>
> *****
>
> By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions. In the event a bank identifies fraudulent or other improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's relationship with the processor, or requiring the processor to cease processing for that specific merchant.

72.     The guidance concludes that:

> The OCC supports national banks' participation in payment systems to serve the needs of legitimate processors and the customers of such processors and to diversify sources of revenue. However, to limit potential risk to banks and consumers, banks should ensure implementation of risk management programs that include appropriate oversight and controls commensurate with the risk and complexity of the activities. At a minimum, bank programs should verify the legitimacy of the processor's business operations, assess the bank's risk level, and monitor processor relationships for activity indicative of fraud.

**Defendants Knew the Out-Of-State Payday Lenders Were Engaged in Unlawful Activities**

73.    At the time Defendants originated the entries on the ACH Network referenced herein, they knew the identity of the Out-Of-State Payday Lenders, they knew the lenders were engaged in the business of making payday loans, and they knew the Out-Of-State Payday Lenders were engaged in the business of making payday loans in states where payday lending was unlawful.

74.    Characteristics of Out-Of-State Payday Lender transactions themselves also notified ODFIs of unlawful activity.

75.    Whether ODFIs contract with Out-Of-State Payday Lenders or their Third Party Senders, ACH debits originated at the request of Out-Of-State Payday Lenders inevitably raise "red flags" to ODFIs, which alert them to the fact that potential unlawful activity is occurring.

76.    Chief among these "red flags" are high return rates on ACH debit transactions.  An ACH debit transaction may be returned for numerous reasons including, *inter alia¸* the account to be debited having insufficient funds or the account owner claiming the debit was not authorized.

77.    ACH debits originated on behalf of the Out-Of-State Payday Lenders far exceed the return rate for all electronic payments of less than 1%.

## FACTS AS TO PLAINTIFF CHRISTOPHER GRAHAM

78.    On or about March 14, 2013, Plaintiff Graham applied for and received a payday loan in the amount of $350 from Spot On Loans by completing an application on the **www.spotonloans.com** website. As part of the application process, Plaintiff Graham authorized Spot On Loans to debit his checking account with Dutch Point Credit Union in order to repay the loan.

21

79.     Spot On Loans charged 30%, or $30 per every $100 borrowed, approximately every two weeks.

80.     Beginning on or about April 5, 2013, Spot On Loans initiated regular debit transactions from Plaintiff Graham's checking account to repay the loan.

81.     On or about April 17, 2013, Plaintiff Graham applied for and received an additional payday loan in the amount of $500 from Spot On Loans by completing an application on the **www.spotonloans.com** website. As part of the application process, Plaintiff Graham authorized Spot On Loans to debit his checking account with Dutch Point Credit Union in order to repay the loan.

82.     On or about June 3, 2013, Plaintiff Graham applied for and received an additional payday loan in the amount of $350 from Spot On Loans by completing an application on the **www.spotonloans.com** website. As part of the application process, Plaintiff Graham authorized Spot On Loans to debit his checking account with Dutch Point Credit Union in order to repay the loan.

83.     On or about July 12, 2013, Spot On Loans initiated debit transactions of $143.70 and $189.00 for Plaintiff Graham's checking account in Connecticut through the ACH Network to pay interest and principal on the payday loans. The ODFI originating this transaction was NBC.

84.     On or about March 15, 2013, Plaintiff Graham applied for and received a payday loan in the amount of $800 from Silver Cloud Financial by completing an application on the **www.silvercloudfinancial.com** website. As part of the application process, Plaintiff Graham authorized Silver Cloud Financial to debit his checking account with Dutch Point Credit Union in order to repay the loan.

85.     Silver Cloud Financial charged 30%, or $30 per each $100 loaned, every two weeks on new customer loans.

86.     Beginning on or about March 22, 2013, Silver Cloud Financial initiated regular debit transactions from Plaintiff Graham's checking account to repay the loan.

87.     On or about May 14, 2013, Plaintiff Graham applied for and received an additional payday loan in the amount of $1,000 from Silver Cloud Financial by completing an application on the **www.silvercloudfinancial.com** website.  As part of the application process, Plaintiff Graham authorized Silver Cloud Financial to debit his checking account with Dutch Point Credit Union in order to repay the loan.

88.     Silver Cloud Financial charged 25%, or $25 per each $100 loaned, every two weeks on returning customer loans.

89.     On or about July 12, 2013, Silver Cloud Financial initiated a debit transaction of $262.50 for Plaintiff Graham's checking account in Connecticut through the ACH Network to repay a payday loan. The ODFI originating this transaction was Defendant MBT.

90.     On or about April 15, 2013, Plaintiff Graham applied for and received a payday loan in the amount of $1200 from Plain Green by completing an application on the **www.plaingreenloans.com** website. As part of the application process, Plaintiff Graham authorized Plain Green to debit his checking account with Dutch Point Credit Union in order to repay the loan.

91.     The loan was to be paid back in 30 bi-weekly payments of $135.21 for a total of $4,056.46.

92.     Thus, the nominal annual interest rate on this loan is 279.22%.

93.     Beginning on or about May 3, 2013, Plain Green initiated biweekly debit transactions of $138.47 from Plaintiff Graham's checking account to repay the loan.

94.     For example, on or about July 12, 2013, Plain Green originated a debit transaction of $138.47 for Plaintiff Graham's checking account in Connecticut through the ACH Network. The ODFI on this was North American Banking Co.

95.     On or about April 23, 2013, Plaintiff Graham applied for and received a payday loan in the amount of $300 from National PDL by completing an application on the **www.nationalpayday.com** website. As part of the application process, Plaintiff Graham authorized National PDL to debit his checking account with Dutch Point Credit Union in order to repay the loan.

96.     National PDL charged a 25% fee on any amount borrowed, or $25 for every $100 borrowed.  The entirety of the interest plus principal, which equaled $375, was due 10 days from the date of the loan.

97.     Beginning on or about May 3, 2013, National PDL initiated regular debit transactions from Plaintiff Graham's checking account to repay the loan.

98.     For example, on or about July 12, 2013, National PDL initiated a debit transaction of $145 for Plaintiff Graham's checking account in Connecticut through the ACH Network. The ODFI originating this transaction was Defendant BMO.

## FACTS AS TO PLAINTIFF ELLEN RUSSO

99.     On or about May 6, 2011, Plaintiff Russo applied for and received a payday loan in the amount of $400.00 from AWL by completing an application on the www.americanwebloan.com website.  As part of the application process, Plaintiff Russo

24

authorized AWL to debit her checking account with People's United Bank in order to pay the loan.

100.    On or about the following dates, AWL initiated debit transactions from Plaintiff Russo's checking account in Connecticut through the ACH Network:

      a.      May 27, 2011, AWL initiated a debit transaction of $120.00;

      b.      June 10, 2011, AWL initiated a debit transaction of $120.00;

      c.      June 24, 2011, AWL initiated a debit transaction of $120.00;

      d.      July 8, 2011, AWL initiated a debit transaction of $120.00;

      e.      July 22, 2011, AWL initiated a debit transaction of $120.00;

      f.      August 5, 2011, AWL initiated a debit transaction of $120.00;

      g.      August 19, 2011, AWL initiated a debit transaction of $120.00;

      h.      September 2, 2011, AWL initiated a debit transaction of $120.00;

      i.      September 16, 2011, AWL initiated a debit transaction of $120.00;

      j.      September 30, 2011, AWL initiated a debit transaction of $120.00;

      k.      October 14, 2011, AWL initiated a debit transaction of $120.00;

      l.      October 28, 2011, AWL initiated a debit transaction of $120.00;

      m.      November 14, 2011, AWL initiated a debit transaction of $120.00;

      n.      November 25, 2011, AWL initiated a debit transaction of $120.00;

      o.      December 9, 2011, AWL initiated a debit transaction of $120.00; and

      p.      December 27, 2011, AWL initiated a debit transaction of $120.00.

101.    The ODFI originating each of these transactions was Defendant MBT.

102.    As a result, Plaintiff Russo paid $1,920.00 in a period of approximately 31 weeks to satisfy a $400.00 loan.  Thus, the annual interest rate on the loan was in excess of 600%.

103.     Plaintiff has applied for and received additional loans from AWL since 2011 and has and continues to make usurious interest payments on these outstanding loans.

104.     On or about January 26, 2011, Plaintiff Russo applied for and received a payday loan in the amount of $350.00 from Cash Cure by completing an application on the www.cashcure.com website.  As part of the application process, Plaintiff Russo authorized Cash Cure to debit her checking account with People's United Bank in order to pay the loan.

105.     On or about the following dates, Cash Cure initiated debit transactions from Plaintiff Russo's checking account in Connecticut through the ACH Network:

    a.     February 14, 2011, Cash Cure initiated debit transactions of $92.75 and $40.00;

    b.     February 28, 2011, Cash Cure initiated a debit transaction of $82.15;

    c.     March 14, 2011, Cash Cure initiated a debit transaction of $82.15;

    d.     March 28, 2011, Cash Cure initiated a debit transaction of $82.15;

    e.     April 11, 2011, Cash Cure initiated a debit transaction of $82.15;

    f.     April 25, 2011, Cash Cure initiated debit transactions of $82.15 and $35.00;

    g.     May 9, 2011, Cash Cure initiated debit transactions of $72.88 and $35.00;

    h.     May 23, 2011, Cash Cure initiated debit transactions of $63.60 and $35.00;

    i.     June 6, 2011, Cash Cure initiated debit transactions of $54.33 and $35.00; and

    j.     June 20, 2011, Cash Cure initiated debit transactions of $45.05 and $35.00.

    k.     July 1, 2011, Cash Cure initiated debit transactions of $35.78 and $35.00;

    l.     July 18, 2011, Cash Cure initiated debit transactions of $35.00 and 26.50;

m.     August 1, 2011, Cash Cure initiated debit transactions of $35.00 and $17.23; and

n.     August 15, 2011, Cash Cure initiated debit transactions of $30.00 and $7.95.

106.   The ODFI originating each of these transactions was Defendant First Premier.

107.   As a result, Plaintiff Russo paid $1,176.82 in a period of approximately 26 weeks to satisfy a $350.00 loan.  Thus, the annual interest rate on the loan was in excess of 400%.

108.   On or about February 15, 2011, Plaintiff Russo applied for and received a payday loan in the amount of $200.00 from One Click Cash by completing an application on the www.oneclickcashonline.com website.  As part of the application process, Plaintiff Russo authorized One Click Cash to debit her checking account with People's United Bank in order to pay the loan.

109.   On or about the following dates, One Click Cash initiated debit transactions from Plaintiff Russo's checking account in Connecticut through the ACH Network:

a.     March 4, 2011, One Click Cash initiated a debit transaction of $60.00;

b.     March 18, 2011, One Click Cash initiated a debit transaction of $60.00;

c.     April 1, 2011, One Click Cash initiated a debit transaction of $60.00;

d.     April 15, 2011, One Click Cash initiated a debit transaction of $60.00;

e.     May 2, 2011, One Click Cash initiated debit transactions of $60.00 and $50.00;

f.     May 13, 2011, One Click Cash initiated debit transactions of $50.00 and $45.00;

g.     May 27, 2011, One Click Cash initiated debit transactions of $50.00 and $30.00; and

27

h.  June 10, 2011, One Click Cash initiated debit transactions of $50.00 and $15.00.

110.  The ODFI originating each of these transactions was Defendant First International.

111.  As a result, Plaintiff Russo paid $590.00 in a period of approximately 23 weeks to satisfy a $200.00 loan.  Thus, the annual interest rate on the loan was in excess of 400%.

112.  On or about July 2, 2013, Plaintiff Russo applied for and received a second payday loan from One Click Cash in the amount of $500.  Plaintiff Russo has and continues to make usurious interest payments on this outstanding loan.

113.  Defendants BMO, NBC, MBT, NABT, First Premier, and First International derived a benefit through the receipt of fees for their origination of debit entries on the ACH Network initiated by Spot On, Plain Green, National Payday, Silver Cloud, AWL, Cash Cure, and One Click Cash (or Third-Party Senders acting on their behalf) and received by Plaintiffs.

## CLASS ACTION ALLEGATIONS

114.  <u>Description of the Class and Sub-Class</u>:  Plaintiffs bring this class action on behalf of themselves and a Class and Sub-Class defined as follows:

> i.  All natural persons within the states of Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia whose accounts were debited via an ACH entry originated by either BMO Harris Bank, N.A., First International Bank & Trust, First Premier Bank, National Bank of California, N.A., Missouri Bank and Trust, or North American Banking Company as an ODFI on behalf of an Out-Of-State Payday Lender in repayment of a loan which was illegal under the law of their respective state at the time of the debit (the "Class").

> ii.  All natural persons within the state of Connecticut whose accounts were debited via an ACH entry originated by either BMO Harris Bank, N.A., First International Bank & Trust, First Premier Bank, National Bank of California, N.A.,

28

> Missouri Bank and Trust, or North American Banking
> Company as an ODFI on behalf of an Out-Of-State Payday
> Lender in repayment of a loan which was illegal under
> Connecticut law (the "Sub-Class").

115.     Excluded from the Class and Sub-Class are Defendants' officers, directors,

affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded

from the Class and Sub-Class is any judge, justice or judicial officer presiding over this matter

and the members of their immediate families and judicial staff.

116.     <u>Numerosity</u>:  The proposed Class and Sub-Class are so numerous that individual

joinder of all members is impracticable.

117.     <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of

law and fact common to Plaintiffs and the Class and Sub-Class, and those questions substantially

predominate over any questions that may affect individual Class and Sub-Class members.

Common questions of fact and law include (a) whether payday loans are usurious and

unenforceable under state or federal law; (b) whether debts owed to payday lenders are incurred

in connection with the business of lending money at an usurious rate; (c) whether the usurious

rate was at least twice the enforceable rate under the law of the states in which Class members

reside; (d) whether Defendants' collection of the illegal or unenforceable debt was made with

actual or constructive knowledge of the illegality of the loans; (e) whether Defendants' collection

of the illegal debt was the proximate cause of the Class and Sub-Class's injuries; (f) whether the

Class and Sub-Class suffered an injury to property by the debiting of their accounts by

Defendants; and (g) should the running of the statute of limitations for the Class and Sub-Class's

claims be equitably tolled.

118.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class and Sub-Class have been similarly affected by BMO's, First International's, First Premier's, NBC's, MBT's and NABC's actions.

119.   <u>Adequacy of Representation</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class and Sub-Class.  Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and Sub-Class, and have the financial resources to do so.

120.   <u>Superiority of Class Action</u>:  Plaintiffs and the members of the Class and Sub-Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class and Sub-Class is impractical.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the Class members.

**FIRST CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by BMO**
**(On Behalf of the Class and Sub-Class)**

121.   Plaintiffs incorporate by reference the preceding paragraphs.

122.   BMO is a "person" as defined by 18 U.S.C. § 1961(3).

123.   The ACH Network is comprised of the following participants:

a.   "Originators," which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.   "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including BMO;

c.   "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.   "Receivers," which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.   "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network ("EPN"), that process ACH transactions between financial institutions; and

f.   "Third Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

124.    The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA.  Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (the "ACH Enterprise") in that:

      a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

      b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise; and

      c.    The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

125.    The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  BMO is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

126.    BMO, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, BMO serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through BMO, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

32

127.    In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as BMO, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

128.    BMO has used its role within ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.      unenforceable because of state or federal laws against usury;

      b.      incurred in connection with the business of lending money at an usurious rate; and

      c.      the usurious rate was at least twice the enforceable rate.

129.    BMO, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew routinely violate state law; and originated debit entries that BMO knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

130.    Pursuant to the fraudulent scheme, BMO participated in the collection of unlawful debts in that:

a.     Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.     BMO then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.     BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

131.    Accordingly, BMO has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

132.    As a direct and proximate result of BMO's violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

## SECOND CLAIM FOR RELIEF
## Violation of 18 U.S.C. § 1962(d) by BMO
## (On Behalf of the Class and Sub-Class)

133.    Plaintiffs incorporate by reference the preceding paragraphs.

134.    BMO and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday

loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

     a.    unenforceable because of state or federal laws against usury;

     b.    incurred in connection with the business of lending money at an usurious rate; and

     c.    the usurious rate was at least twice the enforceable rate.

135.    In furtherance of their agreement, BMO and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

     a.    Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected, in violation of 18 U.S.C. § 1962(c);

     b.    BMO agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected, in violation of 18 U.S.C. §1962(c);

     c.    BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders, in violation of 18 U.S.C. §1962(c).

136.    Accordingly, BMO intentionally conspired and agreed to, directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

137.    As a direct and proximate result of BMO and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

**THIRD CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by First International**
**(On Behalf of the Class and Sub-Class)**

138.    Plaintiffs incorporate by reference the preceding paragraphs.

139.    First International is a "person" as defined by 18 U.S.C. § 1961(3).

140.    The ACH Network is comprised of  the following participants:

a.      "Originators," which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.      "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including First International;

c.      "RDFIs,"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.   "Receivers," which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.   "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.   "Third Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

141.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA.  Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (the "ACH Enterprise") in that:

a.   Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b.   To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise; and

c.      The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

142.    The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  First International is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

143.    First International, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, First International serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through First International, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

144.    In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as First International, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

145.    First International has used its role within ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-

State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

146.    First International, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that First International knew routinely violate state law; and originated debit entries that knew First International were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

147.    Pursuant to the fraudulent scheme, First International participated in the collection of unlawful debts in that:

    a.    Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.    First International then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.    First International knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia

and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

148.    Accordingly, First International has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

149.    As a direct and proximate result of First International's violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by First International and such injury was reasonably foreseeable.

## FOURTH CLAIM FOR RELIEF
## Violation of 18 U.S.C. § 1962(d) by First International
## (On behalf of the Class and Sub-Class)

150.    Plaintiffs incorporate by reference the preceding paragraphs.

151.    First International and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.      unenforceable because of state or federal laws against usury;

      b.      incurred in connection with the business of lending money at an usurious rate; and

      c.      the usurious rate was at least twice the enforceable rate.

152.     In furtherance of their agreement, First International and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

      a.    Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

      b.    First International agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

      c.    First International knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

153.     Accordingly, First International intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

154.     As a direct and proximate result of First International and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and Sub-Class were injured in their

property by the debiting of their bank accounts by First International and such injury was

reasonably foreseeable.

**FIFTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by First Premier**
**(On behalf of the Class and Sub-Class)**

155.    Plaintiffs incorporate by reference the preceding paragraphs.

156.    First Premier is a "person" as defined by 18 U.S.C. § 1961(3).

157.    The ACH Network is comprised of  the following participants:

    a.      "Originators" which include individuals, corporations or other entities that

            initiate entries into the ACH Network, including Out-Of-State Payday

            Lenders;

    b.      "ODFIs" which include all participating financial institutions that originate

            ACH entries at the request of an Originator or Third Party Service Provider

            and agree to abide by the NACHA Operating Rules, including First

            Premier;

    c.      "RDFIs"  which include all participating financial institutions that are

            qualified to receive ACH entries and agree to abide by the NACHA

            Operating Rules;

    d.      "Receivers" which include individuals, corporations or other entities that

            have authorized an Originator to initiate a credit or debit entry to a

            transaction account held at an RDFI;

    e.      "ACH Operators" which include two central clearing facilities, the Federal

            Reserve Banks and Electronic Payments Network (EPN), that process ACH

            transactions between financial institutions; and

f.      "Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

158.    The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA.  Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (the "ACH Enterprise") in that:

a.      Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b.      To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise; and

c.      The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

159.    The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  First Premier is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

160.     First Premier, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, First Premier serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through, First Premier whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

161.     In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as First Premier, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

162.     First Premier has used its role within ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.     unenforceable because of state or federal laws against usury;

      b.     incurred in connection with the business of lending money at an usurious rate; and

      c.     the usurious rate was at least twice the enforceable rate.

163.     First Premier, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on

the Originator's behalf) that First Premier knew routinely violate state law; and originated debit entries that First Premier knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

164.    Pursuant to the fraudulent scheme, First Premier participated in the collection of unlawful debts in that:

      a.     Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

      b.     First Premier then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

      c.     First Premier knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

165.    Accordingly, First Premier has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

166.    As a direct and proximate result of First Premier's violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by First Premier and such injury was reasonably foreseeable.

### SIXTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by First Premier
### (On behalf of the Class and Sub-Class)

167.    Plaintiffs incorporate by reference the preceding paragraphs.

168.    First Premier and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.    unenforceable because of state or federal laws against usury;

      b.    incurred in connection with the business of lending money at an usurious rate; and

      c.    the usurious rate was at least twice the enforceable rate.

169.    In furtherance of their agreement, First Premier and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

      a.    Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.    First Premier agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.    First Premier knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

170.    Accordingly, First Premier intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

171.    As a direct and proximate result of First Premier and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by First Premier and such injury was reasonably foreseeable.

**SEVENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by NBC**
**(On behalf of the Class and Sub-Class)**

172.    Plaintiffs incorporate by reference the preceding paragraphs.

173.    NBC is a "person" as defined by 18 U.S.C. § 1961(3).

174.    The ACH Network is comprised of  the following participants:

a.  "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.  "ODFIs" which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including NBC;

c.  "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.  "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.  "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.  "Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

175.  The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA.  Alternatively, participants in

the ACH network constitute an "association-in-fact" enterprise as those terms are used in 18

U.S.C. § 1961(4) (the "ACH Enterprise") in that:

      a.      Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

      b.      To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

      c.      The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

176.    The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  NBC is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

177.    NBC, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, NBC serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through NBC, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

178.    In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as NBC, and the ODFI must originate the ACH debit.   Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in

this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

179.    NBC has used its role within ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal. Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.    unenforceable because of state or federal laws against usury;

      b.    incurred in connection with the business of lending money at an usurious rate; and

      c.    the usurious rate was at least twice the enforceable rate.

180.    NBC, in its role as an ODFI in the ACH Enterprise, originated  debit entries initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that NBC knew routinely violate state law; and originated debit entries that NBC knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

181.    Pursuant to the fraudulent scheme, NBC engaged in the collection of unlawful debts in that:

      a.    Out-Of-State Payday Lenders originated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected, in violation of 18 U.SC. § 1962(c);

      b.    NBC then initiated ACH entries by which the accounts were debited and the unlawful debts collected, in violation of 18 U.S.C. §1962(c);

c.      NBC knew that the Out-Of-State Payday Lenders were payday lenders and

that payday loans were illegal and unenforceable in Arizona, Arkansas,

Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York,

North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into those states

on behalf of the Out-Of-State Payday Lenders, in violation of 18 U.S.C.

§1962(c).

182.    Accordingly, NBC has directly and indirectly conducted and participated in the

conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation

of 18 U.S.C. § 1962(c).

183.    As a direct and proximate result of NBC's violations of 18 U.S.C. § 1962(c),

Plaintiffs and the members of the Class and Sub-Class were injured in their property by the

debiting of their bank accounts by NBC and such injury was reasonably foreseeable.

**EIGHTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by NBC**
**(On behalf Of Class and Sub-Class)**

184.    Plaintiffs incorporate by reference the preceding paragraphs.

185.    NBC and Out-Of-State Lenders, or Third Party Senders acting on their behalf,

reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday

loans to consumers residing in states that banned the practice and collect usurious interest rates in

violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful

debts" under 18 U.S.C. § 1961(6) in that the loans are:

a.      unenforceable because of state or federal laws against usury;

b.    incurred in connection with the business of lending money at an usurious rate; and

c.    the usurious rate was at least twice the enforceable rate.

186.    In furtherance of their agreement, NBC and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

a.    Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.    NBC agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected, in violation of 18 U.S.C. §1962(c); and

c.    NBC knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders, in violation of 18 U.S.C. §1962(c).

187.    Accordingly, NBC intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

188.    As a direct and proximate result of NBC and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §

1962(d), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by NBC and such injury was reasonably foreseeable.

**NINTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by MBT**
**(On Behalf of the Class and Sub-Class)**

189.    Plaintiffs incorporate by reference the preceding paragraphs.

190.    MBT is a "person" as defined by 18 U.S.C. § 1961(3).

191.    The ACH Network is comprised of the following participants:

a.    "Originators," which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.    "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including MBT;

c.    "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.    "Receivers," which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.    "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and EPN, that process ACH transactions between financial institutions; and

    f.    "Third-Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

192.    The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA.  Alternatively, participants in the ACH network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (the "ACH Enterprise") in that:

    a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise; and

    c.    The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

193.    The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  MBT is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

194.   MBT, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, MBT serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through MBT, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

195.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as MBT, and the ODFI must originate the ACH debit.   Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

196.   MBT has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

   a.   unenforceable because of state or federal laws against usury;

   b.   incurred in connection with the business of lending money at an usurious rate; and

   c.   the usurious rate was at least twice the enforceable rate.

197.   MBT, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that MBT knew routinely violate state law; and originated debit entries that

MBT knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

198.    Pursuant to the fraudulent scheme, MBT engaged in the collection of unlawful debts in that:

        a.    Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected, in violation of 18 U.SC. § 1962(c);

        b.    MBT then originated ACH entries by which the accounts were debited and the unlawful debts collected, in violation of 18 U.S.C. §1962(c);

        c.    MBT knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

199.    Accordingly, MBT has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts, in violation of 18 U.S.C. § 1962(c).

200.    As a direct and proximate result of MBT's violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by MBT and such injury was reasonably foreseeable.

**TENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by MBT**
**(On Behalf of Class and Sub-Class)**

201.    Plaintiffs incorporate by reference the preceding paragraphs.

202.    MBT and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.    unenforceable because of state or federal laws against usury;

      b.    incurred in connection with the business of lending money at an usurious rate; and

      c.    the usurious rate was at least twice the enforceable rate.

203.    In furtherance of their agreement, MBT and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

      a.    Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected, in violation of 18 U.SC. § 1962(c);

      b.    MBT agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c); and

      c.    MBT knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York,

North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into those states

at the request of the Out-Of-State Payday Lenders, in violation of 18

U.S.C. §1962(c).

204.    Accordingly, MBT intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts, in violation of 18 U.S.C. § 1962(c).

205.    As a direct and proximate result of MBT and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by MBT and such injury was reasonably foreseeable.

### ELEVENTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by NABC
### (On behalf of the Class and Sub-Class)

206.    Plaintiffs incorporate by reference the preceding paragraphs.

207.    NABC is a "person," as defined by 18 U.S.C. § 1961(3).

208.    The ACH Network is comprised of  the following participants:

a.    "Originators," which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.    "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including NABC;

58

c.   "RDFIs,"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.   "Receivers," which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.   "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks and EPN, that process ACH transactions between financial institutions; and

f.   "Third Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

209.   The ACH Network constitutes an "enterprise," pursuant to 18 U.S.C. § 1961(4), as an association of multiple legal entities operating under NACHA.  Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (the "ACH Enterprise") in that:

a.   Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b. To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise; and

c. The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

210. The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce. NABC is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

211. NABC, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise. Under the NACHA Operating Rules, NABC serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through NABC, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

212. In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as NABC, and the ODFI must originate the ACH debit. Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

213.    NABC has used its role within ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal. Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.     unenforceable because of state or federal laws against usury;

    b.     incurred in connection with the business of lending money at an usurious rate; and;

    c.     the usurious rate was at least twice the enforceable rate.

214.    NABC, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that NABC knew routinely violate state law; and initiated debit entries that NABC knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

215.    Pursuant to the fraudulent scheme, NABC participated in the collection of unlawful debts in that:

    a.     Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.S.C. § 1962(c);

    b.     NABC then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.     NABC knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas,

Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

216.    Accordingly, NABC has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts, in violation of 18 U.S.C. § 1962(c).

217.    As a direct and proximate result of NABC's violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by NABC and such injury was reasonably foreseeable.

**TWELFTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by NABC**
**(On Behalf of the Class and Sub-Class)**

218.    Plaintiffs incorporate by reference the preceding paragraphs.

219.    NABC and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

   a.    unenforceable because of state or federal laws against usury;

   b.    incurred in connection with the business of lending money at an usurious rate; and

   c.    the usurious rate was at least twice the enforceable rate.

220.    In furtherance of their agreement, NABC and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

    a.    Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected, in violation of 18 U.SC. § 1962(c);

    b.    NABC agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected, in violation of 18 U.S.C. §1962(c); and

    c.    NABC knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders, in violation of 18 U.S.C. §1962(c).

221.    Accordingly, NABC intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts, in violation of 18 U.S.C. § 1962(c).

222.    As a direct and proximate result of NABC and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by NABC and such injury was reasonably foreseeable.

**THIRTEENTH CLAIM FOR RELIEF**
**Assumpsit Against All Defendants**
**(On Behalf of the Sub-Class)**

223.    Plaintiffs incorporate by reference the preceding paragraphs.

224.    Defendants BMO, First International, First Premier, NBC, MBT, and NABC received funds belonging to Plaintiff and the Sub-Class.

225.    Defendants BMO, First International, First Premier, NBC, MBT and NABC's receipt of money belonging to Plaintiff and the Sub-Class was improper because the money represented repayments of debts that were illegal and unenforceable.

226.    Defendants BMO, First International, First Premier, NBC, MBT and NABC benefited from receipt of the funds.

227.     Plaintiffs and the Sub-Class are entitled to return of the funds received by BMO, NBC, MBT and NABC.

228.    Because the funds received from Plaintiffs and the Sub-Class are, upon information and belief, no longer in the possession of BMO, First International, First Premier, NBC, MBT and NABC, Plaintiffs have a right to restitution *at law* from BMO, First International, First Premier, NBC, MBT and NABC.

**FOURTEENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Connecticut Usury Statute**
**(On Behalf of the Class)**

229.    Plaintiffs incorporate by reference the preceding paragraphs.

230.    Pursuant to Conn. Gen. St. § 37-4, all loans at a rate greater than 12% per annum are prohibited.  "***No person*** and no firm or corporation or agent thereof…shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, ***directly or indirectly, charge,***

***demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum***" (emphasis added).

231.     As set forth more fully above, in the course of making and collecting on payday loans to consumers in Connecticut, Defendants repeatedly and knowingly "charge, demand, accept…interest at a rate greater than twelve per cent per annum," in violation of Conn. Gen. St. § 37-4.

232.     Defendants aided and abetted the Out-Of-State Payday Lenders' violations of Connecticut usury law.

233.     On the dates specified above, Defendants credited and withdrew money from Plaintiffs' checking accounts and electronically transmitted it to the Out-Of-State Payday Lenders.

234.     In making these withdrawals, credits and transmissions, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Out-Of-State Payday Lenders.

235.     At the time Defendants made these electronic withdrawals and transfers, they knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity.

236.     Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

237.     Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.

238.     At the time Defendants transmitted these funds, they knowingly assisted the Out-Of-State Payday Lenders and were incentivized to do so by a bare profit motive.

239.     As a result of Defendants' knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the Connecticut usury law referenced herein.

### FIFTHTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of the Connecticut Small Loan Law
#### (On Behalf of the Class)

240.     Plaintiffs incorporate by reference the preceding paragraphs.

241.     Pursuant the Connecticut Small Loan Law, Conn. Gen. Statute §§ 36a-563, lenders duly licensed by the State of Connecticut Department of Banking may charge the following on short-term loans:

> On any loan which does not exceed one thousand eight hundred dollars, excluding charges, or on any unsecured loan or on any loan secured only by credit life insurance, seventeen dollars per one hundred dollars on that part of the cash advance, not exceeding six hundred dollars, and eleven dollars per one hundred dollars on any remainder when the loan is made payable over a period of one year, and proportionately at those rates over a longer or shorter term of loan… Such charges shall be computed at the time the loan is made on the full amount of the cash advance for the full term of the loan contract.

242.     The Out-Of-State Payday Loans made to Plaintiff Graham and Plaintiff Russo in Connecticut were made by Out-of-State Payday Lenders who have not been licensed by the Department of Banking to make short-term loans.

243.     As set forth more fully above and incorporated by reference herein, the Out-Of-State Payday Loans made to Plaintiff Graham and Plaintiff Russo in Connecticut featured interest or fees in excess of $17 per $100 loaned, and did so for short-term loans much shorter in duration than one year, in violation of Conn. Gen. Statute §§ 36a-563.

244.     BMO, First International, First Premier, NBC, MNT, and NABC aided and abetted the Out-Of-State Payday Lenders' violations of the Connecticut Short Term Loan Law by

providing the necessary access to the ACH system to carry out the Out-Of-State Payday Lenders' illegal scheme.

245.     In providing the necessary access to the ACH system to carry out the Out-Of-State Payday Lenders' illegal scheme, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Out-Of-State Payday Lenders.

246.     At the time Defendants provided the necessary access to the ACH system to carry out the Out-Of-State Payday Lenders' illegal scheme, they knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity.

247.     Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

248.     Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.

249.     As a result of BMO, First International, First Premier, NBC, MNT, and NABC's knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the Connecticut Short Term Lending Law referenced herein.

**SIXTEENTH CLAIM FOR RELIEF**
**Violation of Connecticut Unfair Trade Practices Act**
**C.G.S. § 42-110a, *et seq.***
**(On Behalf of the Class)**

250.     Plaintiffs incorporate by reference the preceding paragraphs.

251.     At all times relevant hereto, Plaintiffs and class members were "persons" within the meaning of CUTPA (C.G.S. § 42-110a, *et seq.*).

252.     Defendants are engaged in trade or commerce within the meaning of Connecticut General Statute § 42-110a.

253.     Described herein are unfair and deceptive acts and practices in violation of C.G.S.

§ 42-110b(a), including, *inter alia*:

> a.     repeatedly conspiring with and aiding and abetting Out-Of-State Payday
>
> Lenders to charge  illegal, usurious, and unconscionable fees for payday
>
> loans; and
>
> b.     repeatedly aiding and abetting Out-Of-State Payday Lenders, to circumvent
>
> Connecticut lending and consumer protection law.

254.     As a result of Defendants' unfair business practices, Plaintiffs and members of the

Sub-Class have suffered ascertainable losses within the meaning of C.G.S. § 42-110g(a) and have

been damaged by Defendants' unlawful acts.

255.     Defendants' fraudulent and deceptive acts and practices present an ongoing threat

and likelihood of harm to members of the public and constitute a fraud upon the members of the

public, as well as unfair, unlawful and deceptive acts, in violation of CUTPA.

256.     Defendants' conduct as alleged in this cause of action constitutes intentional and

wanton violation of Plaintiffs' rights and the rights of the members of the Class, or was done with

a reckless indifference to those rights.

257.     As a direct and proximate result of the foregoing acts and/or omissions of

Defendants, Plaintiffs and members of the Sub-Class were damaged in an amount to be

determined at trial.

### SEVENTEENTH CAUSE OF ACTION
### Permanent Injunctive Relief
### (On Behalf of the Class and Sub-Class)

258.     Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and, to the

extent necessary, pleads this cause of action in the alternative.

259.    Defendants BMO, First International, First Premier, NBC, MBT and NABC should be enjoined and prohibited from serving as the ODFI for Out-Of State Payday Lenders and directed to immediately credit to all Out-Of-State Payday Lender borrowers, any money it has debited from borrowers' accounts but has not yet remitted to Out-Of-State Payday Lenders.

**WHEREFORE**, Plaintiffs, on their behalf and on behalf of the Class and Sub-Class seek judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a)    Under 18 U.S.C. § 1964(c), awarding each member of Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(b)    Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(c)    Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from First International for First International's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which First International was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(d)    Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from First International for First International's violations of 18 U.S.C. §

69

1962(d) consisting of a refund of every ACH debit from their account in which First International was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(e)     Under 18 U.S.C. § 1964(c), awarding each member of Class and Sub-Class damages from First Premier for First Premier's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(f)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from First Premier for First Premier's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(g)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from NBC for NBC's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which NBC was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(h)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from NBC for NBC's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which NBC was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(i)      Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from MBT for MBT's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which MBT was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(j)      Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from MBT for MBT's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which MBT was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(k)      Under 18 U.S.C. § 1964(c), awarding each  member of Class and Sub-Class damages from NABC for NABC's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which NABC was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(l)      Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from NABC for NABC's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which NABC was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(m)     Permitting each member of the Sub-Class to recover damages in assumpsit from all Defendants consisting of a refund of every ACH debit from their account in

71

which Defendants were the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender;

(n)     Compelling Defendants to disgorge in a common fund for the benefit of Plaintiffs and the Class all wrongful or inequitable proceeds received from them.  A constructive trust should be established over all the proceeds in Defendants' possession belonging to Plaintiffs and members of the Class and Sub-Class.

(o)     Awarding the Sub-Class damages against all Defendants as aiders and abettors to the violations of the Connecticut usury law;

(p)     Awarding the Sub-Class damages against all Defendants as aiders and abettors to the violations of the Connecticut Small Loan Law;

(q)     Awarding the Sub-Class injunctive relief, restitution, damages, and penalties as against all Defendants  pursuant to the Connecticut Unfair Trade Practices Act;

(r)     Granting a permanent injunction enjoining and prohibiting Defendants from serving as the ODFI for Out-Of-State Payday Lenders and directing Defendants to immediately credit to all Out-Of-State Payday Lenders' borrowers, any money they have  debited from borrowers' accounts but have not yet remitted to Out-Of-State Payday Lenders;

(s)     Awarding Plaintiffs' attorneys' fees and costs in pursuing this action; and

(t)     Awarding such other and further relief as this Court deems just, proper and equitable.

## JURY DEMAND

Plaintiffs hereby demand a jury trial in the instant action.

Dated:  October 4, 2013

Respectfully submitted,

**SHEPHERD FINKLEMAN MILLER
& SHAH LLP**

By:     /s/Karen M. Leser-Grenon
        James E. Miller (ct 21560)
        Karen M. Leser-Grenon (ct23587)
        65 Main Street
        Chester, CT 06412
        Tel: (860) 526-1100
        Fax: (860) 526-1120
                jmiller@sfmslaw.com
                kleser@sfmslaw.com


**CHITWOOD HARLEY HARNES LLP**
Darren T. Kaplan, *pro hac vice forthcoming*
1350 Broadway, Suite 908
New York, NY 10018
Tel: (917) 595-3600
Fax: (404) 876-4476
dkaplan@chitwoodlaw.com


**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel, *pro hac vice forthcoming*
Steve Six, *pro hac vice forthcoming*
J. Austin Moore, *pro hac vice forthcoming*
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:     (816) 714-7100
Fax:     (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com


**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow, *pro hac vice forthcoming*
Jason H. Alperstein, *pro hac vice forthcoming*
200 S.W. 1st Avenue, 12th Floor

73

Fort Lauderdale, Florida 33301
Tel:     (954) 525-4100
Fax:     (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei, *pro hac vice forthcoming*
Jeffrey D. Kaliel, *pro hac vice forthcoming*
Anna C. Haac, *pro hac vice forthcoming*
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036
Tel:     (202) 973-0900
Fax:     (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
ahaac@tzlegal.com

*Counsel for Plaintiffs and the Class*