**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHRISTOPHER GRAHAM, and ELLEN RUSSO, on Behalf of Themselves and All Others Similarly Situated, | : : : | |
| | : | |
| Plaintiffs, | : | CASE NO. 3:13-cv-01460 (WWE) |
| | : | |
| v. | : | |
| | : | |
| BMO HARRIS BANK, N.A., NATIONAL BANK OF CALIFORNIA, N.A., FIRST INTERNATIONAL BANK & TRUST, a North Dakota State-Chartered Bank, FIRST PREMIER BANK, a South Dakota State-Chartered Bank, MISSOURI BANK AND TRUST, a Missouri-Chartered Bank, and NORTH AMERICAN BANKING COMPANY, a Minnesota State-Chartered Bank, | : : : : : : : : : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM IN SUPPORT OF MISSOURI BANK'S MOTION TO DISMISS**

**BRYAN CAVE LLP**
1290 Avenue of The Americas
New York, NY  10104-3300
(212) 541-1228
(212) 904-0506 (fax)
*Attorneys for Missouri Bank and Trust*

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

ARGUMENT ....................................................................................................... 6

I.      PLAINTIFFS' FAILURE TO JOIN THEIR LENDERS AS INDISPENSABLE
        PARTIES REQUIRES DISMISSAL ........................................................ 6

II.     PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM ........................ 9

        A.      Plaintiffs Fail to State a Plausible RICO Claim ....................... 10

                1.      Plaintiffs Fail to Plead a Legally Cognizable RICO Enterprise. ............... 12

                2.      Missouri Bank Did Not Operate or Manage the Alleged Enterprise ......... 16

                3.      Plaintiffs Have Not Adequately Alleged Missouri Bank's Knowledge .... 18

                4.      Plaintiffs Have Failed to Establish the Collection of Unlawful Debt. ....... 19

                5.      Plaintiffs Cannot Establish a Conspiracy to Commit a RICO
                        Violation. ............................................................................... 20

        B.      Plaintiffs Fail to State Any Plausible State Law Claim ............................ 21

                1.      Aiding and Abetting Liability under Connecticut's Usury Laws ............. 21

                2.      Violations of the Connecticut Unfair Trade Practices Act ...................... 23

                3.      Assumpsit. ................................................................................. 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*AARP v. American Family Prepaid Legal Corp., Inc.*,
  604 F. Supp. 2d 785 (M.D.N.C. 2009) ................................................................. 15

*Abrahams v. Young & Rubicam, Inc.*
  692 A.2d 709 (Conn. 1997) ................................................................................... 23

*Alfadda v. Fenn*,
  1993 U.S. Dist. LEXIS 8852 (S.D.N.Y. Jun. 29, 1993) ....................................... 25

*Allen v. New World Coffee, Inc.*,
  2001 WL 293683 (S.D.N.Y. Mar. 27, 2001) ................................................... 20, 21

*Amsterdam Tobacco, Inc. v. Philip Morris, Inc.*,
  107 F. Supp. 2d 210, (S.D.N.Y. 2000) .................................................................. 18

*Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*,
  660 F. Supp. 1362 (D. Conn. 1987) ....................................................................... 18

*Anschutz Corp. v. Merrill Lynch & Co.*,
  690 F.3d 98 (2d Cir. 2012) .................................................................................... 17

*Arista Records LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) .................................................................................. 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 10

*Beck v. Prupis*,
  529 U.S. 494 (2000) ............................................................................................... 11

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 10

*Boyle v. U.S.*,
  556 U.S. 938 (2009) ......................................................................................... 12, 14

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ............................................................................................... 13

*Chambers v. Time Warner, Inc.*
  282 F.3D 147 (2d Cir. 2002) ................................................................................... 3

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
  187 F.3d 229 (2d Cir. 1999) .................................................................................. 20

*Conn. Pipe Trades Health Fund v. Philip Morris, Inc.*,
   153 F. Supp. 2d 101 (D. Conn. 2001) ........................................................................ 24

*Corsi v. Eagle Publishing, Inc.*,
   2008 WL 239581 (D.D.C. Jan. 30, 2008) .................................................................... 9

*Crichton v. Golden Rule Ins. Co.*,
   576 F.3d 392 (7th Cir. 2009) ...................................................................................... 17

*Cruz v. FXDirectDealer, LLC*,
   720 F.3d 115 (2d Cir. 2013) ....................................................................................... 12

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*,
   755 F.2d 239 (2d Cir. 1985) ................................................................................. 19, 20

*Elsevier Inc. v. W.H.P.R., Inc*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010) ....................................................................... 17

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004) ....................................................................................... 12

*First Nationwide Bank v. Gelt Funding, Corp.*,
   820 F. Supp. 89 (S.D.N.Y. 1993) .............................................................................. 13

*Global Discount Travel Svcs., LLC v. Trans World Airlines*,
   960 F.Supp. 701 (S.D.N.Y. 1997) ........................................................................... 6, 7

*Gold v. Rowland*,
   994 A.2d 106 (Conn. 2010) ....................................................................................... 25

*Granito v. IBM*,
   2003 Conn. Super. LEXIS 1045 (Conn. Super Ct. Apr. 16, 2003) ............................ 25

*Hardy v. IGT, Inc.*,
   2011 U.S. Dist. LEXIS 90852 (M.D. Ala. Aug. 15, 2011) ...................................... 8, 9

*Hayden v. Paterson*,
   594 F.3d 150 (2d Cir. 2010) ....................................................................................... 10

*Hemmerdinger Corp. v. Ruocco*,
   2013 WL 5516194 (E.D.N.Y., Oct. 7, 2013) ............................................................ 13

*In re Ins. Brokerage Antitrust Litig.*,
   2007 WL 1062980 (D.N.J. Apr. 5, 2007) .................................................................. 13

*In re MasterCard Int'l Inc., Internet Gambling Litig.*,
   132 F. Supp. 2d 468 (E.D. La. 2001) ........................................................... 11, 12, 18

iii

*In re SmithKline Beecham Clinical Labs., Inc. Lab. Testing Billing Practices Litig.,*
  108 F. Supp. 2d 84 (D. Conn. 1999) ................................................................ 11, 15, 16

*In re Succession of Wardlaw v. Whitney Nat'l Bank,*
  1994 WL 577442 (E.D. La. 1994) ............................................................................ 18, 19

*Int'l Audiotext Network v. American Tel. & Tel. Co.,*
  62 F.3d 69 (2d Cir. 1995) ................................................................................................... 3

*Jubelirer v. MasterCard International, Inc.,*
  68 F. Supp. 2d 1049 (W.D. Wis. 1999) ........................................................................ 13, 17

*Katzman v. Victoria's Secret Catalogue,*
  167 F.R.D. 649 (S.D.N.Y. 1996) ................................................................................... 11

*Kermanshah v. Kermanshah,*
  2010 WL 1904315 (S.D.N.Y. May 11, 2010) ............................................................... 8

*Lacertosa v. Blackman Plumbing Supply Co.,*
  2013 WL 3728803 (E.D.N.Y. Jul. 12, 2013) .......................................................... 10, 11

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,*
  951 F. Supp. 1071 (S.D.N.Y. 1996) ............................................................................. 17

*Law Offices of Becnel v. John Arthur Eaves Law Firm,*
  2001 WL 1242105 (E.D. La. Oct. 16, 2001) ............................................................... 8

*Lerner v. Fleet Bank, N.A.,*
  318 F.3d 113 (2d Cir. 2003) ......................................................................................... 11

*Maersk, Inc. v. Neewra, Inc.,*
  687 F. Supp. 2d 300 (S.D.N.Y. 2009) ......................................................................... 20

*Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,*
  739 F. Supp. 2d 109 (D. Conn. 2010) ......................................................................... 22

*Missouri River Hist. Dev., Inc. v. Penn Nat'l Gaming, Inc.,*
  283 F.R.D. 501 (N.D. Iowa 2012) ................................................................................. 7

*Panix Promotions, Ltd. v Lewis,*
  2002 WL 72932 (S.D.N.Y. Jan. 17, 2002) ................................................................. 20

*Parker v. Colgate-Palmolive Co.,*
  2003 Conn. Super. LEXIS 2487 (Conn. Super Ct. Aug. 8, 2003) ............................. 25

*Reves v. Ernst & Young,*
  507 U.S. 170 (1993) ..................................................................................................... 17

iv

*Rosenzweig v. Brunswick Corp.*,
  2008 WL 3895485 (D.N.J. Aug. 20, 1998) ............................................................. 9

*Schuster v. Anderson*,
  413 F. Supp. 2d 983 (N.D. Iowa 2005) .................................................................. 15

*Short v. Conn. Cmty. Bank, N.A.*,
  2012 U.S. Dist. LEXIS 42617 (D. Conn. Mar. 28, 2012) ...................................... 22

*Stanley Ferber & Assocs. v. Northeast Bancorp., Inc.*,
  1993 WL 489334 (Conn. Super. Ct. Nov. 16, 1993) ......................................... 22, 23

*Town of Stratford v. Castater*,
  46 A.3d 945 (Conn. App. Ct. 2012) ....................................................................... 24

*Travelers Indem. Co. v. Household Int'l, Inc.*,
  775 F.Supp. 518 (D. Conn. 1991) ........................................................................ 7, 8

*U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*,
  303 F. Supp. 2d 432 (S.D.N.Y. 2004) ................................................................... 20

*U.S. v. Coonan*,
  938 F.2d 1553 (2d Cir. 1991) ............................................................................... 13

*U.S. v. Huber*,
  603 F.2d 387 (2d Cir. 1979) ................................................................................. 14

*U.S. v. Persico*,
  2011 WL 2433728 (E.D.N.Y. June 14, 2011) ....................................................... 20

*U.S. v. Turkette*,
  452 U.S. 576 (1981) ......................................................................................... 12, 16

*United State ex rel. Hall v. Tribal Dev. Corp.*,
  100 F.3d 476 (7th Cir. 1996) ................................................................................. 8

*Vacco v. Microsoft Corp.*,
  793 A.2d 1048 (Conn. 2002) ................................................................................ 24

*VanDenBroeck v. CommonPoint Mortgage Co.*,
  210 F.3d 696 (6th Cir. 2000) ..................................................................... 13, 14, 15

**Statutes**

18 U.S.C. § 1961(4) ................................................................................................... 12

18 U.S.C. § 1962 ....................................................................................................... 11

18 U.S.C. § 1962(c) ................................................................................... 11, 16, 19, 21

18 U.S.C. § 1962(d) ............................................................................................. 20

18 U.S.C. §§ 1962(c)-(d) ........................................................................................ 5

Conn Gen. Stat. § 36a-563 ................................................................................... 22

Conn. Gen. Stat. § 37-4 ........................................................................................ 22

Conn. Gen. Stat. § 42-110g(a) ............................................................................. 23

Conn. Gen. Stat. § 42-110a .................................................................................... 6

Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 (1970) ...................... 11

**Rules**

Fed. R. Civ. P. 12(b)(6)-(7) .................................................................................... 1

Fed. R. Civ. P. 12(b)(7) ........................................................................................... 6

Fed. R. Civ. P. 19 ......................................................................................... 1, 2, 6

Fed. R. Civ. P. 19(a) ................................................................................................ 6

Fed. R. Civ. P. 19(b) ................................................................................................ 7

Fed. R. Civ. P. 8(a) ................................................................................................ 10

Fed. R. Civ. P. 8(a)(2) ........................................................................................... 10

**Treatises**

Charles A. Wright, Arthur R. Miller & Mary Kane, *7 Federal Practice & Procedure* § 1613
(West 2001) ....................................................................................................... 8

## INTRODUCTORY STATEMENT

Defendant Missouri Bank & Trust ("Missouri Bank") respectfully submits this memorandum of law in support of its motion to dismiss the Class Action Complaint ("Complaint") of Plaintiffs Christopher Graham ("Graham") and Ellen Russo ("Russo") (collectively "Plaintiffs") pursuant to Rule 12(b)(6)-(7) and Rule 19 of the Federal Rules of Civil Procedure.

Plaintiffs allege that they entered into loan agreements with Silver Cloud Financial ("Silver Cloud") and American Web Loan ("AWL"), lenders which allegedly offer short-term "payday loans" over the Internet. They now claims that the loans were usurious under Connecticut law. But rather than assert a claim against the lenders they contend charged them usurious interest rates, they instead decided to sue one of the several parties that plays a function in transmitting electronic payments from bank account to bank account. Plaintiffs authorized that payments on their loans be made automatically from their bank accounts through the Automated Clearing House ("ACH") Network ("ACH Network"), which is used to process billions of electronic payments in any given year. Plaintiffs are not Missouri Bank customers and Missouri Bank was not the lender. All Missouri Bank did was to transmit the Plaintiffs' instructions to debit their accounts to their own banks, which actually debits the accounts. Plaintiffs do not allege that Missouri Bank actually knew any relevant information about the debit transaction or that it would need to know anything other than their banks' identities and their account numbers. Plaintiffs' allegations fall well short of showing the actual knowledge they would need to show in order to prevail on any of their claims.

Plaintiffs rely on the civil RICO statute in their attempt to hold Missouri Bank responsible for performing what is essentially a routine banking function. Plaintiffs have long attempted to misuse RICO because of its promise of treble damages and the stigma that attaches

to those who are accused of racketeering activity, and courts have long rejected attempts to expand RICO beyond its limits, as Plaintiffs seek to do here.

The Complaint should be dismissed as to both Plaintiffs for two equally strong, independent reasons.[1] First, Plaintiffs have failed to join their lenders as defendants. Under Rule 19, the lenders are indispensable parties. Plaintiffs' entire complaint depends upon their initial premise that their loan contracts are illegal and unenforceable under the law applicable to this case. If that assertion is incorrect, none of their claims can succeed. Yet the lenders cannot be joined because they are presumptively immune from suit and/or because any claim brought against them is plainly subject to an arbitration agreement.[2]

Second, Plaintiffs fail to state a plausible claim upon which relief may be granted. Their RICO claims must fail because they fail to adequately allege (i) the existence of a relevant enterprise, (ii) that Missouri Bank participated in the management and control of any such enterprise, (iii) that it had the requisite knowledge to be liable under RICO, (iv) that its ministerial activities constituted the collection of an unlawful debt, or, (v) that there was, in fact, a conspiracy to violate RICO. Plaintiffs also assert a hodgepodge of state law claims which fail as a matter of law. For these reasons, as further set forth below, the Complaint should be dismissed.

---

[1]    In addition, while not a ground for dismissal because it involves matters wholly outside the pleadings, Russo's claim against Missouri Bank is factually impossible. Russo alleges that she entered into a loan with AWL in 2011 and made numerous payments on her loan during 2011, and that Missouri Bank was the ODFI associated with the debit entries. Missouri Bank has no record of any 2011 transaction involving AWL, and did not perform any ACH-related services for AWL until 2012 at the earliest.

[2]    The same loan agreements that require Graham's claims to be arbitrated also require his claims against Missouri Bank to be arbitrated. Missouri Bank has simultaneously moved to compel arbitration based on the arbitration provisions contained in Graham's loan agreements with Silver Cloud. That motion raises a threshold question that should be determined before the Court considers the issues presented in this Motion as to Graham.

# FACTUAL BACKGROUND

## *Christopher Graham*

Graham alleges that on or about March 15, 2013, he applied for and obtained a loan in the amount of $800.00 from Silver Cloud, via a website called www.silvercloudfinancial.com. (Compl., ¶¶ 19b, 84.)   He further claims that on or about May 14, 2013 he applied for and obtained a loan in the amount of $1,000 through the same website.  Silver Cloud is described as "a tribal lending entity owned by the Habematolel Pomo of Upper Lake, California." (*Id.*  ¶ 19b.) Graham's loan agreements (the "Loan Agreements") were mentioned in his complaint but not attached.  The Loan Agreements contain clearly labeled arbitration provisions in which Graham broadly agreed to arbitrate all disputes arising from his loan agreements, and waived his right to pursue such claims in court.[3]  These provisions are described in greater detail in Missouri Bank's motion to compel arbitration.

In the Loan Agreements Graham "authorized Silver Cloud Financial to debit his checking account with Dutch Point Credit Union in order to repay the loan."  (*Id.* ¶¶ 84, 87.)  He further alleges that on or about July 12, 2013, Silver Cloud initiated a debit transaction from his checking account in the amount of $262.50, allegedly representing a payment on one of Graham's loans.  (*Id.* ¶ 89).  Graham alleges that the Originating Depository Financial Institution ("ODFI", as further explained on p. 5 below) associated with this transaction was Missouri Bank. (*Id.*)  Other than this single transmission of instructions relating to a single electronic payment, Missouri Bank is not alleged to have performed any act relating to Graham or his loan.

---

[3]      The Loan Agreements, which were completed and electronically signed by Plaintiff, can be considered by the Court on these motions to compel and dismiss because they are integral to Plaintiffs' Complaint.  *See, Time Warner, Inc. v. Chambers*, 282 F.3d 147, 153 (2d 2002); *see also Int'l Audiotext Network v. American Tel. & Tel. Co.*, 62 F.3d 69 (2d Cir. 1995) (finding that on a motion to dismiss court could consider terms and effect of the agreement heavily relied on by plaintiff in its amended complaint).

*Ellen Russo*

With respect to Missouri Bank, Russo alleges that on or about May 6, 2011, she applied for and obtained a loan in the amount of $400.00 from American Web Loan ("AWL"), which was doing business under the domain name of www.americanwebloan.com. (Complaint, ¶¶ 19f, 99.) Plaintiffs' allege that AWL represents that it is "a tribal lending entity owned by the Otoe-Missouria Tribe of Indians." (*Id.* ¶ 19f.) Russo admits that she "authorized AWL to debit her checking account with People's United Bank in order to pay the loan." (*Id.* ¶ 99.) Russo further alleges that between May 27, 2011 and December 27, 2011, AWL initiated debit transactions from her checking account by instructing People's United Bank to debit her account; she alleges that the ODFI associated with this debit transaction was Missouri Bank. (*Id.* ¶¶ 100, 101.) Other than transmission of instructions relating to these electronic payments, all of which allegedly occurred during the year 2011, Missouri Bank is not alleged to have performed any act relating to Russo or her loan.[4]

*Allegations Common to Both Plaintiffs*

Both Plaintiffs allege that they were injured when their bank accounts were debited through ACH transactions.  The ACH Network "is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing." (Compl. ¶ 38.)  According to the Complaint, the ACH Network processed more than 21 billion transactions with a total dollar value of $36.9 trillion during the year 2012.  In the terminology of the ACH Network and under the governing rules of the private, non-profit NACHA (formerly the National Automated Clearing House Association), customers such as Plaintiffs are

---

[4]      In fact, as indicated in footnote 1, Missouri Bank could not have been the ODFI associated with the 2011 AWL transaction, because it did not provide any ACH-related services for AWL until 2012 at the earliest.

4

"Receivers" because they and their banks receive instructions; a merchant such as the lender is an "Originator" because it and its ODFI originate the instructions. (*Id*. ¶ 43.)

In an ACH transaction, a Receiver authorizes a transaction with a merchant.  (*Id*.) Plaintiffs allege that with respect to the payday loan transactions at issue, they were a customer-- and therefore a Receiver.  The Originator, Plaintiffs allege, then communicates the purported authorization to its ODFI. (*Id.*)  The ODFI's role is to transmit the instruction through the "ACH Operator" (the Federal Reserve Bank or the Electronic Payments Network) to the customer's bank, which is called the Receiving Depository Financial Institution or "RDFI".  (*Id.*)  The RDFI is responsible for actually debiting the customer's bank account.  (*Id.*)

Plaintiffs allege that Missouri Bank is an ODFI in regards to Graham's May Agreement and Russo's Agreement.[5]  Missouri Bank is not alleged to be the lender or holder of any of Plaintiffs' loans, and is not alleged to have participated in any fashion other than in its role as ODFI, which again is essentially to transmit payment instructions to the customer's bank.

Despite this, Plaintiffs allege that Missouri Bank participated in a vast conspiracy with various unnamed "Out-Of-State Payday Lenders" to use the ACH Network to facilitate the making of payday loans to consumers residing in states where such transactions allegedly violate state law.  (*Id*. ¶¶ 202-205.)  Plaintiffs claim that Missouri Bank violated and conspired with Out-Of-State Payday Lenders to violate RICO, 18 U.S.C. §§ 1962(c)-(d), that it aided and abetted violations of Connecticut's usury statutes and the Connecticut Small Loan Law, and that it violated Connecticut's statute prohibiting unfair trade practices, Conn. Gen. Stat. § 42-110a. Plaintiffs also assert claims based on the common law theory of assumpsit and seek injunctive as

---

[5]   In regards to Graham's March Agreement, on or about March 22, 2013, Silver Cloud originated a debit transaction from his checking account, allegedly representing a payment on Graham's loan. (Compl. ¶ 86.)  Graham does not allege that Missouri Bank was the ODFI associated with this transaction.

well as monetary relief.  Plaintiffs bring their claims both individually and on behalf of a putative

class of other customers who allegedly received payday loans that are illegal in the state of their

residence and who had their bank accounts debited by Missouri Bank and/or the other

Defendants.

## ARGUMENT

### I.    PLAINTIFFS' FAILURE TO JOIN THEIR LENDERS AS INDISPENSABLE PARTIES REQUIRES DISMISSAL

Rule 12(b)(7) of the Federal Rules of Civil Procedure provides that a plaintiff's failure to

join a party required under Rule 19 is a proper basis for dismissal.  Under Rule 19, the Court

must first determine whether the absent party is "necessary."  Rule 19(a) provides the framework

for this determination:

> A person who is subject to service of process and whose joinder
> will not deprive the court of subject-matter jurisdiction must be
> joined as a party if: (A) in that person's absence, the court cannot
> accord complete relief among existing parties; or (B) that person
> claims an interest relating to the subject of the action and is so
> situated that disposing of the action in the person's absence may:
> (i) as a practical matter impair or impede the person's ability to
> protect the interest; or (ii) leave an existing party subject to a
> substantial risk of incurring double, multiple, or otherwise
> inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).  If the party is necessary under Rule 19(a) but joinder of that party is

impossible, the Court must determine whether "under the circumstances of the particular case,

the court could, in equity and good conscience, proceed in the party's absence."  *Global*

*Discount Travel Svcs., LLC v. Trans World Airlines*, 960 F. Supp. 701, 707 (S.D.N.Y.

1997)(citation omitted).  Rule 19(b) lists four non-exhaustive factors that a court may consider in

deciding whether to label an absent party indispensable and thus dismiss the action due to that

party's absence:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

Fed. R. Civ. P. 19(b).  If the Court determines that the case cannot proceed in the absence of a necessary party, that party is deemed indispensable, and dismissal is appropriate.  *Global Discount*, 960 F. Supp. at 710.

Here, Plaintiffs' lenders are indispensable parties.  Plaintiffs' entire lawsuit is premised on their allegations that their Loan Agreements are usurious, illegal and void.  The Loan Agreements are the alleged "unlawful debts" on which Plaintiffs base their RICO claims.  (Compl. ¶ 196.)  Plaintiffs also seek to hold Missouri Bank liable under Connecticut's usury statute on a secondary liability theory in which the lenders are among the alleged primary violators.  (*Id*. ¶¶ 230-239.)  The remaining claims also depend on the validity and interpretation of Plaintiffs' Loan Agreements.  (*Id*. ¶ 225 (assumpsit claim based on "debts that were illegal and unenforceable"); ¶ 242 (violations of the Connecticut Small Loan Law premised on the loans made to Plaintiffs);  ¶ 253 (deceptive acts and practices claim based on allegedly illegal loans).

For Plaintiffs to prevail as to any of their claims, a court will necessarily have to determine, at a minimum, that the underlying loan contracts were illegal.  Many courts have held that when a contract's validity and interpretation are at issue, the parties to the contract are indispensable.  *See Travelers Indem. Co.*, 775 F. Supp. at 527 ("[T]he precedent supports the proposition that a contracting party is the paradigm of an indispensable party.");  *see also Missouri River Hist. Dev., Inc. v. Penn Nat'l Gaming, Inc.*, 283 F.R.D. 501 (N.D. Iowa 2012) (holding that contracting party was necessary and indispensable where "a judicial decision would

impair or impede its ability to protect its interests" under the contract); *United State Ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479 (7th Cir. 1996) ("[N]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable."); *Kermanshah v. Kermanshah*, No. 08-cv-409, 2010 WL 1904135, at *3 (S.D.N.Y. May 11, 2010) ("It is well established that a party to a contract which is the subject of litigation is considered a necessary party.")(citation omitted); *Law Offices of Becnel v. John Arthur Eaves Law Firm*, No. Civ. A. 01-1944, 2001 WL 1242105, *2 (E.D. La. Oct. 16, 2001) ("In cases seeking reformation, cancellation, rescission, or otherwise challenging the validity of a contract, all parties to the contract probably will have a substantial interest in the outcome of the litigation and their joinder will be required.") (*quoting* Charles A. Wright, Arthur R. Miller & Mary Kane, *7 Federal Practice & Procedure* § 1613 (West 2001)).

Moreover, Plaintiffs' lawsuit challenges not only their particular loan agreements, but the lenders' entire business model as well.  (Compl. ¶ 19(d), 19(f) (alleging that Silver Cloud and AWL maintain the websites "for the purpose of making illegal Out-Of-State Payday Loans" and that Silver Cloud and AWL "[are] in the business of making and collecting 'unlawful debts'").  This case is similar to *Hardy v. IGT, Inc.*, No. 2:10-CV-901, 2011 U.S. Dist. LEXIS 90852 (M.D. Ala. Aug. 15, 2011), in which the plaintiff filed a class action on behalf of people who lost money playing electronic bingo at tribal casinos in Alabama, where gambling is illegal.  Like the Plaintiffs here, the plaintiff avoided suing the party with whom she had a contractual relationship—the tribal owners and operators of the casinos—and instead sued the manufacturers of the gaming equipment. *Id*. at *12.  Yet the plaintiff's complaint was based on the fundamental premise that the tribal casinos were being operated in violation of Alabama law. *Id*. at *15.  The

8

court concluded that the tribe was an indispensable party: "Necessary to [plaintiff's] state law cause of action is a determination that the electronic bingo played on the Tribe's real estate and in its Casinos violates Alabama law and/or federal law.  One struggles to envision a more severe practical impediment to the Tribe's interests in its Casinos and related business arrangements…." *Id*. at *15 (citations omitted); *see also id.*  at *18-25. Likewise, a ruling here that Silver Cloud and AWL entered into illegal contracts with Plaintiffs, and are in the *business* of making such illegal loans, would clearly prejudice these lenders in their various related contracts and business relationships.

In *Hardy* and numerous other cases, the nonparty was an Indian tribe that was deemed indispensable because it was subject to sovereign immunity.  2011 U.S. Dist. LEXIS 90852, at *18-20.  Notably, the court in *Hardy* dismissed the case even though it left the plaintiff without a remedy  *Id.* at *24.   Here, the Court is not faced with the same concern as to Graham's agreements with Silver Cloud, as those agreements provide for arbitration.  In fact, this stands as a separate reason why Silver Cloud, in particular, cannot be joined in this suit, and is therefore indispensable.  *See Corsi v. Eagle Publ'g, Inc.*, No. 07-CV-02004, 2008 WL 239581, at *5 (D.D.C. Jan. 30, 2008) (holding that contracting party was indispensable based on finding that it could not be joined due to arbitration clause in the underlying contracts and dismissing suit); *see also Rosenzweig v. Brunswick Corp.*, No. Civ. A. 08-807, 2008 WL 3895485, at *9 (D.N.J. Aug. 20, 1998) (dismissal based on forum selection clause which affected ability to join necessary party).

## II.    PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM

A complaint must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails to provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  A complaint must plead "sufficient facts

'to state a claim to relief that is plausible on its face.'" *Lacertosa v. Blackman Plumbing Supply Co.,* No. 10-CV-1984, 2013 WL 3728803, at *4 (E.D.N.Y. Jul. 12, 2013) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007)).  As explained by the Supreme Court, "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 555).

A claim has the "facial plausibility" required to defeat a motion to dismiss "when the plaintiff pleads factual content that allows the court to draw the reasonable conclusion that the defendant is liable for the misconduct alleged." *Id.*  The complaint's factual allegations must raise more than a speculative right to relief.  *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Twombly*, 550 U.S. at 555).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)).  Claims that are only conceivable, but not plausible, must be dismissed.  *See Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

A.     <u>Plaintiffs Fail to State a Plausible RICO Claim</u>

The purpose of the RICO statute was "to seek the eradication of organized crime in the United States."  *See* Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 922-23 (1970); *see also Beck v. Prupis*, 529 U.S. 494, 496 (2000) (discussing purpose of RICO). Federal courts "have cautioned that alleged RICO violations must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not

gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations." *Lacertosa*, 2013 WL 3728803, at *4 (citations omitted). Civil RICO is widely recognized as "an unusually potent weapon – the litigation equivalent of a thermonuclear device." *In re SmithKline Beecham Clinical Labs., Inc. Lab. Testing Billing Practices Litig.*, 108 F. Supp. 2d 84, 92 (D. Conn. 1999)(citation omitted). Because of this reality, and "[b]ecause the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)(citation omitted).

To state a civil RICO claim, Plaintiffs must allege as to each defendant that while employed by or associated with an enterprise engaged in interstate or foreign commerce, the defendant conducted or participated "directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To establish standing to assert RICO claims, a plaintiff must show: "(1) the defendant's violation of § 1962; (2) an injury to the plaintiff's business or property; and (3) causation of the injury by the defendant's violation. This third requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003) (citations and punctuation omitted); *In re MasterCard Int'l Inc., Internet Gambling Litig.*, 132 F. Supp. 2d 468, 477 (E.D. La. 2001) (though standing is generally a threshold question, it is appropriate to analyze it last because RICO standing is dependent upon first finding a violation of § 1962 and then determining whether it caused the plaintiff's injury). "[A] RICO plaintiff must plead the specified facts as to

11

each defendant.  It cannot avoid Rule 12(b)(6) by 'lumping together the defendants.'"  *In re MasterCard*, 132 F. Supp. 2d at 476 (citation omitted).

Plaintiffs' RICO claims against Missouri Bank fail because Plaintiffs have not sufficiently alleged the existence of an enterprise; that Missouri Bank participated in the operation or management of any alleged enterprise; that Missouri Bank is "in the business" of, and participated in, the collection of unlawful debt; nor that Missouri Bank had knowledge of any alleged illegal activity.  Finally, because Plaintiffs have failed to establish an underlying RICO violation, their claims for RICO conspiracy also must fail.

1.    <u>Plaintiffs fail to plead a legally cognizable RICO enterprise.</u>

A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  To adequately allege an "association-in-fact" enterprise, a plaintiff must allege "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 556 U.S. 938, 946 (2009); *see U.S. v. Turkette*, 452 U.S. 576, 583 (1981) (An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct.").  In addition, "[f]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)).

Courts in this circuit look to the "hierarchy, organization, and activities" of an alleged association-in-fact enterprise to determine whether the members functioned as a continuing unit. *See First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993) (citing

12

*U.S. v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991)); *Hemmerdinger Corp. v. Ruocco*, No. 12-cv-2650, 2013 WL 5516194, at *10 (E.D.N.Y., Oct. 7, 2013) ("[F]or RICO purposes, an association-in-fact is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.")(citation omitted); *see also VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696 (6th Cir. 2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (affirming dismissal of RICO claims for failure to allege association-in-fact enterprise when there was no evidence of any "chain of command" or hierarchical structure).

Courts do not tolerate RICO complaints that do nothing more than allege industry-wide conspiracies and then seek to define the enterprise as nothing more than the interactions among members of a given industry. *See In re Ins. Brokerage Antitrust Litig.*, No. Civ. 05-1019, 2007 WL 1062980, at *21 (D.N.J. Apr. 5, 2007) (rejecting "bare industry-wide conspiracy"); *First Nationwide Bank*, 820 F. Supp. at 98 ("Conclusory allegations that disparate parties were associated in fact by virtue of their involvement in the real estate industry in the 1980s are insufficient to sustain a RICO claim, absent allegations as to how the members were associated together in an 'enterprise.'   Nor does common sense support the existence of such an 'enterprise.'"); *Jubelirer v. MasterCard Int'l, Inc.*, 68 F. Supp. 2d 1049, 1053 (W.D. Wis. 1999) ("Accepting plaintiff's allegations as sufficient to allege a RICO enterprise would lead to the absurd conclusion that each of the many million combinations of merchant, MasterCard, and lender is a RICO enterprise.").

Here, the Plaintiffs do not allege the existence of an enterprise consisting of a single legal entity; instead, they describe the ACH Network as "an association of multiple legal entities operating under NACHA."  (Compl. ¶ 192).  Plaintiffs "alternatively" allege that "participants in

the ACH network constitute an 'association-in-fact' enterprise as those terms are used in [the RICO statute]." (*Id.*).  Plaintiffs' "alternate" theories ultimately lead to the same place, however, since a group of "multiple legal entities" should be evaluated as an association-in-fact enterprise.  *See U.S. v. Huber*, 603 F.2d 387, 393-94 (2d Cir. 1979).   Thus, Plaintiffs must allege the structural features of a common purpose, relationships among those associated with the enterprise, and longevity.  *See Boyle*, 556 U.S. at 946.  Plaintiffs have failed to do so.

In *VanDenBroeck*, the plaintiff alleged that a sub-prime lender was engaged in a scheme with various un-named secondary lenders to sell loans and collect undisclosed and unreasonable fees.  210 F.3d at 699.  As in this case, the plaintiff alleged an elaborate scheme involving multiple interrelated transactions taking place throughout the marketplace.  *Id.* at 700.  The district court noted that there were allegedly dozens of secondary lenders purchasing the loans, and the lack of any allegations that there were a discreet number of secondary lenders used "mean[t] that this conspiracy could have transpired with any lender in the secondary lending market."  *Id.*  The district court found that these facts did not show any type of mechanism by which the primary lender and the entire secondary lending market conducted its affairs or made decisions.  The Sixth Circuit agreed, affirming dismissal of the RICO claims "[d]ue to the fact that the enterprise alleged to exist in this case is too unstable and fluid an entity to constitute a RICO enterprise."  *Id.*

Similar to the alleged facts in *VanDenBroeck*, Plaintiffs have alleged here that the "ACH Enterprise" consisted of the entire ACH Network, made up of thousands of unnamed participants – including Originators, ODFIs, RDFIs, Receivers, ACH Operators and Third Party Service Providers.  (*See* Compl. ¶¶ 191-192.)  Thus, the alleged conspiracy to collect unlawful payday loan debt could have transpired with any payday lender Originator or Third Party Service

Provider, any RDFI, and any Receiver.  The alleged ACH Enterprise is "too unstable and fluid" to possibly constitute a RICO enterprise that operates as a continuing unit and has a hierarchical structure, and thus, Plaintiff has failed to allege a RICO enterprise.  *See VanDenBroeck*, 210 F.3d at 700; *see also Schuster v. Anderson*, 413 F. Supp. 2d 983, 1005 (N.D. Iowa 2005) (noting that the threshold problem with the complaint in *VanDenBroeck* "was the instability and lack of continuity of the putative enterprise's members," and that *VanDenBroeck* stood for the proposition "that alleging the existence of a 'business relationship' with an unlimited number of participators in a relative market is not enough to establish an enterprise for RICO purposes").

Additionally, Plaintiffs admit that they authorized various Originators to debit their checking accounts to repay certain payday loans (*see, e.g.,* Compl. ¶¶ 78, 81, 82, 84, 87, 90, 95, 99, 104, 108), and by their own expansive definition, they are necessarily participants in the transactions they complain of, and are also participants in the ACH Enterprise.  Because of this, Plaintiffs cannot plausibly satisfy the requirement that an association-in-fact enterprise have a shared common purpose to engage in a course of conduct.  *See AARP v. Am. Family Legal Corp., Inc.*, 604 F. Supp. 2d 785, 793-94 (M.D.N.C. 2009).  It is not enough to allege that *some* members of the ACH Enterprise—namely, Missouri Bank and the Out-Of-State Lenders—had a shared purpose to facilitate and collect unlawful payday loans.  (*See* Compl. ¶ 158.)  All members of the ACH Enterprise, including Plaintiffs and their bank, must share a common purpose.  *See AARP*, 604 F. Supp. 2d at 793-94; s*ee also SmithKline Beecham*, 62 F. Supp. 2d at 552-53.

In *SmithKline Beecham*, numerous health care insurers and payers for health care services sued SmithKline Beecham Clinical Laboratories ("SBCL") for allegedly engaging in fraudulent billing practices.  62 F.Supp. 2d at 547-48.  The plaintiffs alleged that SBCL defrauded health

care payers in connection with the performance and billing of laboratory tests through the nationwide manipulation of the "Billing Network," which constituted a RICO enterprise.  *Id.* at 549.  Plaintiffs argued that the common purpose of the enterprise was "the billing and testing for medical services."  *Id.* at 552.  However, the court noted that the plaintiffs failed to allege how the "group of persons associated together for a common purpose of engaging in a course of conduct," and how they "functioned as a continuing unit."  *Id.* at 553 (quoting *Turkette*, 452 U.S. at 583).  The court noted that the amended complaint was "devoid of any specific allegation that any physician, hospital, or laboratory shared SBCL's alleged common purpose to defraud public and private health care payers," and it held that the so-called "Billing Network" did not constitute a RICO enterprise.  *Id.* at 553.  Similarly, Plaintiffs here have failed to allege how all of the participants in the ACH Enterprise – including all Originators, ODFIs, RDFIs, Receivers, ACH Operators and Third-Party Service Providers – functioned as a continuing unit and operated together for a common purpose of collecting unlawful debt.

### 2.   Missouri Bank Did Not Operate or Manage the Alleged Enterprise

Even if Plaintiffs sufficiently alleged the existence of the ACH Enterprise, which they have not, a properly pled RICO claim requires allegations that each defendant "participated in the operation or management of the enterprise itself."  *Elsevier Inc. v. W.H.P.R., Inc*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).  Thus, Plaintiffs must allege "facts that, if proved, would demonstrate some degree of control over the enterprise."  *Id*. at 308.  Each defendant must be alleged to have played "some part in directing the enterprise's affairs."  *Reves*, 507 U.S. at 183.  This "'operation and management test' […] is a very difficult test to satisfy."  *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1090 (S.D.N.Y. 1996) (citations omitted), *abrogated on other grounds as recognized by Anschutz Corp. v. Merrill Lynch & Co*, 690 F.3d 98, 115 (2d Cir. 2012).

"[M]erely having a business relationship with and performing services for [a RICO] enterprise, including financial, accounting and legal services, does not support RICO liability because performance of such services is not the equivalent of participation in the operation and management of the enterprise." *Jubelirer*, 68 F. Supp. 2d at 1053; *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009) ("[A]n association-in-fact enterprise must be meaningfully distinct from the entities that constitute it such that the entity sought to be held liable can be said to have controlled and conducted the enterprise rather than merely its own affairs."). If a service provider did not participate in the operation or management of the enterprise, dismissal is required even if "the service provider knows of the enterprise's illicit nature or performs improper acts itself." *Jubelirer*, 68 F. Supp. 2d at 1053; *see In re Succession of Wardlaw v. Whitney Nat'l Bank*, 1994 WL 577442, at *5 (E.D. La. 1994) (dismissing charges against commercial bank when the bank's involvement was limited to "process[ing] deposits and withdrawals," finding that "[e]ven if it did so with the knowledge that these deposits and withdrawals were fraudulent, such guilty knowledge is not enough to convert it into an active participant in the management of the criminal enterprise").

Rather than pleading facts, the Complaint offers only conclusory allegations that NACHA characterizes ODFIs as "the gatekeepers of the ACH Network" (Compl. ¶ 48), that Missouri Bank is an ODFI associated with the ACH Enterprise through its role as an ODFI, and that Missouri Bank is therefore "responsible for all entries originated through [Missouri Bank]." (*Id*. ¶ 194.) These fall far short of constituting factual allegations that Missouri Bank participated in the operation or management of the alleged "ACH Enterprise." *See Amsterdam Tobacco, Inc. v. Philip Morris, Inc.*, 107 F. Supp. 2d 210, 217 (S.D.N.Y. 2000) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one

becomes liable under RICO as a result.").   In fact, Missouri Bank's alleged role of initiating debit entries on the ACH Network is analogous to the commercial bank's role of processing deposits and withdrawals in *In re Succession of Wardlaw v. Whitney National Bank*, wherein the court held that the bank was not an active participant in the management of the criminal enterprise.   *See* 1994 WL 577442, at *5; *see also In re MasterCard*, 132 F. Supp. 2d at 490 (Plaintiff failed to show that defendant exercised actual control over the enterprise when all that was alleged was that "the defendants provided financial services in much the same manner they do to millions of others").

> 3.   Plaintiffs Have Not Adequately Alleged Missouri Bank's Knowledge

A defendant can be said to have participated or conducted an enterprise's affairs "only if it assisted with knowledge of the illegal activities."   *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F. Supp. 1362, 1370-71 (D. Conn. 1987) ("A person that assists another in some unknown activity does not conduct the activity and is not a participant.").   A plaintiff's claims must be dismissed where the plaintiff fails to adequately allege that the defendant acted with knowledge of the unlawful conduct.   *Id.* at 1372.

Here, Plaintiffs' conclusory allegations that Missouri Bank knew that certain debit entries for which it provided instructions violated state law are insufficient to state a plausible RICO claim.   Plaintiffs do state that Missouri Bank initiated debit entries originated by Out-Of-State Payday Lenders that Missouri Bank knew routinely violated state law; and initiated debit entries that Missouri Bank knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines; but these allegations lack any factual support and are entitled to no weight on this motion.   (*See* Compl. ¶ 197).   Plaintiffs also allege that Missouri Bank initiated ACH debit entries on behalf of payday lenders "into" states that Missouri Bank knew outlawed payday

loans.  (*Id.* ¶ 198(c)).  Yet again, there are no factual allegations supporting Missouri Bank's alleged knowledge of such conduct.  (Indeed, in an ACH transaction, an ODFI does not transmit entries "into states"—the ODFI transmits an instruction to the ACH Operator.)  Plaintiffs never allege that Missouri Bank actually knew anything about their state of residence, the nature of the transaction to which the debits relate, or what law would govern any aspect of the underlying transactions.  Nor do they—or could they—allege that an ODFI would have to receive such information when it receives an instruction from a lender or third-party service provider.  Even if Plaintiffs had so alleged, Missouri Bank's limited involvement of merely initiating debit transactions in the ACH Network is not enough to convert it into an active participant in the *management* of a RICO enterprise.  *See In re Succession of Wardlaw*, 1994 WL 577442, at *5.

4.    <u>Plaintiffs Have Failed to Establish the Collection of Unlawful Debt.</u>

The RICO statute assigns liability to defendants that conduct or participate in the affairs of an enterprise through a pattern of racketeering activity or through the collection of unlawful debt.  18 U.S.C. § 1962(c).  "The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability seems to have been an explicit recognition of the evils of loan sharking, and there is no indication that Congress was taking aim at legitimate banking institutions."  *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985).  Thus, "RICO is concerned with evils far more significant than the simple practice of usury," and to prove that an unlawful debt was collected, the plaintiff must show: (1) that the debt was unenforceable in whole or in part because of state or federal laws relating to usury, (2) that the debt was incurred in connection with "the business of lending money at a usurious rate," and (3) that the usurious rate was at least twice the enforceable rate.  *Id.* at 248.  To survive a motion to dismiss, a plaintiff must allege that ***each defendant*** was lending money at a rate that is usurious under state or

19

federal law, and that ***each defendant*** was in the business of doing so.  *See U.S. v. Persico*, No. 10-CR-147, 2011 WL 2433728, at *2 (E.D.N.Y. June 14, 2011).  Here, Plaintiffs do not allege that Missouri Bank was lending money at all, much less that it was engaged in the business of lending money at a usurious rate; rather, Missouri Bank is alleged as an ODFI to have delivered payment instructions for an ACH transaction in connection with loans from a third party to the Plaintiffs.  Because Plaintiffs here do not and cannot allege that Missouri Bank was in the business of collecting unlawful debt nor that it was lending money at a usurious rate, its RICO claims must be dismissed.

> 5.     Plaintiffs Cannot Establish a Conspiracy to Commit a RICO
>        Violation.

To state a claim for RICO conspiracy under 18 U.S.C. § 1962(d), a plaintiff must allege that "each defendant by words or actions, manifested an agreement to [collect an unlawful debt] in furtherance of the common purpose of a RICO enterprise."  *See Panix Promotions, Ltd. v Lewis,* No. 01 Civ. 2709, 2002 WL 72932, at *8 (S.D.N.Y. Jan. 17, 2002) (citations and punctuation omitted); *Maersk, Inc. v. Neewra, Inc.,* 687 F. Supp. 2d 300, 331 (S.D.N.Y. 2009) (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244-45 (2d Cir. 1999)). In addition, "[a]n individual may be liable only if he knew of the conspiracy's goals and agreed to facilitate them."  *Allen v. New World Coffee, Inc.*, No. 00 Civ. 2610, 2001 WL 293683, at *9 (S.D.N.Y. Mar. 27, 2001).  Thus, "[c]onclusory allegations that all of the defendants conspired among themselves to further the scheme to defraud and knowingly and willingly participated in the conspiracy are insufficient." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453-54 (S.D.N.Y. 2004) (citations omitted).  Furthermore, if the substantive RICO claims fail to sufficiently allege a violation, the RICO conspiracy claims must also fail.  *See*

*Allen*, 2001 WL 293683, at *9 ("The Second Circuit has held that there can be no RICO conspiracy without a substantive RICO violation.").

Other than the bare, conclusory allegation that Missouri Bank and Out-Of-State Lenders (or Third-Party Senders acting on their behalf) "reached an agreement . . . to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law" and "agreed to take certain acts to facilitate the collection of unlawful debts" (*see* Compl. ¶¶ 202-203), there are no factual allegations that would support a claim for RICO conspiracy. For instance, Plaintiffs do not allege when this "agreement" was made, which specific entities agreed to it, or by what words or acts the alleged conspirators manifested their agreement. The conspiracy allegations are thus deficient. Moreover, because Plaintiffs have failed to properly allege a RICO violation under 1962(c), as discussed above, their RICO conspiracy claims must also fail for this separate reason. *See Allen*, 2001 WL 293683, at *9.

**B.    Plaintiffs Fail to State Any Plausible State Law Claim[6]**

1.    Aiding and Abetting Liability under Connecticut's Usury Laws

Plaintiffs' Complaint contains claims for aiding and abetting violations under the Connecticut usury statute and small loan law. (Compl., ¶¶ 229-249.) Connecticut's usury statute prohibits interest rates on loans that exceed 12% per annum. Conn. Gen. Stat. § 37-4. Connecticut's small loan law provides specific limits on interest that can be charged on small loans. For example, under the small loan law, a lender cannot charge interest or fees in excess of $17 per $100 loaned when the loan amount is below $1,800. Conn. Gen. Stat. § 36a-563. It is

---

[6]    Plaintiffs do not sufficiently allege facts showing that Connecticut law is applicable to their loan agreements or to any of their claims, and their state law claims all fail for this reason. Yet, for purposes of this Motion, Missouri Bank is assuming that Connecticut law applies.

21

unclear whether Connecticut courts would recognize a claim for aiding and abetting violations of these statutes.

This ultimately does not matter, however, because Plaintiffs have not alleged sufficient knowledge on Missouri Bank's part to support a claim based on aiding and abetting. A claim for aiding and abetting requires proof of the following elements: "(1) the party whom the defendant aids [performed] a wrongful act that cause[d] an injury; (2) the defendant [was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant […] knowingly and substantially assist[ed] the principal violation." *Short v. Conn. Cmty. Bank, N.A.,* No. 3:09-cv-1955(VLB), 2012 U.S. Dist. LEXIS 42617, at *41-42 (D. Conn. Mar. 28, 2012) (citations omitted). Connecticut courts have required a detailed showing of "actual knowledge" and "substantial assistance" on the part of the aider and abettor. *Id*. The critical element of the knowledge requirement is that the defendant had "actual knowledge of the underlying tort" or "act[ed] with reckless indifference to the possibility that the underlying tort is occurring." *Id.* at *42 (dismissing aiding-and-abetting claim at summary judgment stage where the evidence established, at most, "mere negligence"); *see also Master-Halco, Inc. v. Scillia Dowling & Natarelli, LLC*, 739 F. Supp. 2d 109, 121 (D. Conn. 2010) ("what must be proven for aider-abettor liability is that the individual gave substantial assistance to the tortfeasor in carrying out the tort with the knowledge – or reckless indifference to the possibility – that the assistance would aid in carrying out that tort."). Importantly, this knowledge element must be pled with sufficient detail to withstand a motion to dismiss – "cryptic, undetailed and conclusory pleading" will not suffice. *Stanley Ferber & Assocs. v. Northeast Bancorp., Inc.*, Nos. CV 93-0344932, CV 93-0344931, 1993 WL 489334, at *6-7 (Conn. Super. Ct. Nov. 16, 1993) (striking claim for aiding and abetting breach of fiduciary

duty because, *inter alia*, the complaint did not adequately allege that the defendant knew of the underlying tortious activity).

Plaintiffs' conclusory allegations that Missouri Bank knew of the illegal payday loan activity are devoid of any factual support. For instance, there are no allegations that Missouri Bank knew where Plaintiff lived, or knew the terms of the loan being repaid, or what state's law would apply to the transactions. Without these, Plaintiff cannot show that Missouri Bank specifically knew that it was processing a transaction representing a payment by a Connecticut resident in connection with a transaction that was illegal in Connecticut. Without more than the conclusory and argumentative suggestion that Missouri Bank should have known it was aiding and abetting violations of Connecticut usury law, Plaintiffs' claim must fail.

### 2.   Violations of the Connecticut Unfair Trade Practices Act

The CUTPA authorizes claims to be brought by "[a]ny person who suffers any ascertainable loss of money or property […] as a result of the use or employment of a method, act or practice prohibited by section 42-110b." Conn. Gen. Stat. § 42-110g(a). "[I]n order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, 'as a result of' this act, the plaintiff suffered an injury." *Abrahams v. Young & Rubicam, Inc.*, 692 A.2d 709, 712 (Conn. 1997). Thus, under the CUTPA a plaintiff must establish that the defendant's alleged conduct proximately caused plaintiff's injury. *Id*. This proximate cause element limits recovery to "those who were **directly** injured by a defendant's unfair trade practices." *Conn. Pipe Trades Health Fund v. Philip Morris, Inc.*, 153 F. Supp. 2d 101, 112, 113-114 (D. Conn. 2001) (emphasis added). Accordingly, Connecticut courts have regularly dismissed claims similar to this case in which the complained injuries were too removed or indirect with respect to defendant's alleged misconduct. *See, e.g. id.* at 112 (dismissing CUTPA claim brought by a health benefit plan against defendant tobacco company

23

seeking to recover money spent on treating smoking related injuries suffered by the plan members because the "harm to plaintiffs [was] [too] remote"); *Vacco v. Microsoft Corp.*, 793 A.2d 1048, 1067 (Conn. 2002) (Trial court properly struck CUTPA claim because "plaintiff's injuries are too remote in relation to the defendant's conduct").

Here, Plaintiffs claimed injuries that they paid usurious interest (Compl. ¶ 253(a)) were the direct result of the loans issued by the Out-of-State Lenders, not Missouri Bank. Plaintiffs acknowledge that it was the Out-of-State Lenders who "initiated [the] debit transactions" from their checking accounts. (*Id.* ¶¶ 86, 89, 100, 105, 109.) While Missouri Bank allegedly played a role in transferring funds between Plaintiffs and the Out-of-State Lenders, such involvement renders Plaintiffs' alleged injuries far too "remote" and "indirect" to satisfy the CUTPA's proximate cause requirement. *Conn. Pipe Trades Health Fund*, 153 F. Supp. 2d at 113. For these reasons, Graham's claims under CUTPA should be dismissed.

### 3. Assumpsit

Assumpsit is a tort action "to recover back money paid by mistake where the payor is free from any moral or legal obligation to make the payment and the payee in good conscience has not right to retain it." *Town of Stratford v. Castater*, 46 A.3d 945, 950 (Conn. App. Ct. 2012). The words "payor" and "payee" indicate that to recover under a theory of assumpsit, Plaintiffs must demonstrate that they conferred a direct monetary benefit on Missouri Bank. *Id.* While Connecticut's law governing assumpsit claims is sparse, courts have made clear that assumpsit is similar to an unjust enrichment claim. *See, e.g., Town of Stratford v. Castater*, 46 A.3d 945, 950 (Conn. App. Ct. 2012) ("The action of indebitatus assumpsit for the recovery of money had and received" lies where "the defendant would otherwise be unjustly enriched."); *Gold v. Rowland*, 994 A.2d 106, 118, n. 15 (Conn. 2010). A claim for unjust enrichment claim fails as a matter of law where the plaintiff did not confer a direct benefit on the defendant. *See*

24

*Parker v. Colgate-Palmolive Co.*, No. 08CV030193798S, 2003 Conn. Super. LEXIS 2487, at *5 (Conn. Super Ct. Aug. 8, 2003) (striking an unjust enrichment claim where "there [was] no allegation that the plaintiff had paid [money] directly to [defendant]"); *Granito v. IBM*, No. X07 CV02 0080440, 2003 Conn. Super. LEXIS 1045, at *4-5 (Conn. Super. Ct. Apr. 16, 2003) (striking claim for unjust enrichment because plaintiff did not "confer[] a benefit directly upon the defendant rather than merely through the chain of commerce.")

In order for Plaintiffs to recover on a claim of assumpsit, they would have to allege that Missouri Bank fraudulently obtained the processing fees at issue in this action.  In addition, they must show that they conferred a direct benefit upon Missouri Bank.  Plaintiffs do not allege that Missouri Bank obtained any benefit from its receipt of their funds, or for that matter, that Missouri Bank actually *retains* their funds for its own use.  The only way in which Missouri Bank is alleged to benefit from the transactions described in the Complaint is that it allegedly receives a fee for its services.  (Compl. ¶ 113.)  Yet Plaintiffs do not allege anywhere that it was they, as opposed to the party who dealt directly with Missouri Bank, who paid these fees. Because Plaintiffs have not adequately alleged that Missouri Bank actually received the benefit of their funds, their claim fails as a matter of law.[7]

## CONCLUSION

For all the foregoing reasons, Missouri Bank respectfully requests that this Court grant its motion in all respects, dismiss Plaintiff's Complaint in its entirety and grant such other, further and different relief as this Court deems just and proper.

---

[7]     Since all of Plaintiffs' claims against Missouri Bank fail on the merits, their request for permanent injunctive relief necessarily fails as well.  *See Alfadda v. Fenn*, No. 89 Civ. 6217 (LMM), 90 Civ. 4470 (LMM), 1993 U.S. Dist. LEXIS 8852, at *1 (S.D.N.Y. Jun. 29, 1993).

Respectfully submitted by,

BRYAN CAVE LLP,

//s// Robert M. Thompson
Robert M. Thompson, *pro hac vice*
Ashley N. Gillard, *pro hac vice*
BRYAN CAVE LLP
1200 Main St., Suite 3800
Kansas City, MO 64105
rmthompson@bryancave.com
ashley.gillard@bryancave.com
(816) 374-3200
(816) 374-3300 (fax)

Michael P. Carey
BRYAN CAVE LLP
One Atlantic Center, Fourteenth Floor
1021 W. Peachtree St., N.W.
Atlanta, GA 30309
404 572 6600
404 572 6999 (fax)
michael.carey@bryancave.com

Christine B. Cesare, Ct Bar No. 412295
1290 Avenue of The Americas
New York, NY   10104-3300
(212) 541-1228
(212) 904-0506 (fax)
cbcesare@bryancave.com

ATTORNEYS FOR DEFENDANT
MISSOURI BANK AND TRUST

KC01DOCS\1139308.5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

//s// Robert M. Thompson
Robert M. Thompson, *pro hac vice*
rmthompson@bryancave.com

27