# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHRISTOPHER GRAHAM and ELLEN RUSSO, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BMO HARRIS BANK, N.A., NATIONAL BANK OF CALIFORNIA, N.A., FIRST INTERNATIONAL BANK & TRUST, a North Dakota State-Chartered Bank, FIRST PREMIER BANK, a South Dakota State-Chartered Bank, MISSOURI BANK AND TRUST, a Missouri State-Chartered Bank, and NORTH AMERICAN BANKING COMPANY, a Minnesota State-Chartered Bank,<br><br>Defendants. | Case No. 3:13-cv-01460-WWE<br><br>Hon. Warren W. Eginton<br><br><br><br><br><br><br><br><br><br><br><br>Dated: February 5, 2014 |

## DEFENDANT BMO HARRIS BANK, N.A.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION

A. John P. Mancini (No. ct04975)
MAYER BROWN LLP
1675 Broadway
New York, New York 10019-5820
Telephone: (212) 506-2295
Facsimile: (212) 262-1910
jmancini@mayerbrown.com

Lucia Nale (*Pro Hac Vice*)
Debra Bogo-Ernst (*Pro Hac Vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Telephone)
(312) 701-7711 (Facsimile)
lnale@mayerbrown.com
dernst@mayerbrown.com

Kevin Ranlett (*Pro Hac Vice*)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000 (Telephone)
(202) 263-3300 (Facsimile)
kranlett@mayerbrown.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I. INTRODUCTION ..................................................................................................1

II. ARGUMENT ..........................................................................................................1

    A. Graham Cannot Avoid Arbitration By Claiming That His Loan Agreement Is Illegal Or Unenforceable ................................................................1

    B. Graham Cannot Avoid Arbitration By Suing BMO Harris Instead Of His Lender ..................................................................................................4

        1. Graham is equitably estopped from avoiding his agreement to arbitrate ..................................................................................................4

            a. Graham's claims are intertwined with the terms of his loan agreement ..................................................................................................5

            b. Graham's complaint alleges a close relationship between BMO Harris and his lender ..................................................................................................7

        2. BMO Harris may enforce the arbitration provision as a third party beneficiary of the loan agreement .............................................................9

III. CONCLUSION .....................................................................................................10

# TABLE OF AUTHORITIES
(continued)

Page(s)

**CASES**

*In re A2P SMS Antitrust Litig.*,
   --- F. Supp. 2d ----, 2013 WL 5202824 (S.D.N.Y. Sept. 16, 2013) ................................. 3, 4, 5

*Alghanim v. Alghanim*,
   828 F. Supp. 2d 636 (S.D.N.Y. 2011) ............................................................................... 8

*In re Apple & ATTM Antitrust Litig.*,
   826 F. Supp. 2d 1168 (N.D. Cal. 2011) .......................................................................... 5, 9

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009) ........................................................................................................... 9

*Bailey v. ERG Enters., LP*,
   705 F.3d 1311 (11th Cir. 2013) ......................................................................................... 7

*Birmingham Assocs. Ltd. v. Abbott Labs.*,
   547 F. Supp. 2d 295 (S.D.N.Y. 2008) ............................................................................... 6

*Brantley v. Republic Mortg. Ins. Co.*,
   424 F.3d 392 (4th Cir. 2005) ............................................................................................. 7

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006) ........................................................................................................... 2

*In re Currency Conversion Fee Antitrust Litig.*,
   265 F. Supp. 2d 385 (S.D.N.Y. 2003) ............................................................................... 6

*Denney v. BDO Seidman, L.L.P.*,
   412 F.3d 58 (2d Cir. 2005) ................................................................................................ 8

*Denney v. Jenkens & Gilchrist*,
   412 F. Supp. 2d 293 (S.D.N.Y. 2005) ............................................................................... 7

*Fox v. Computer World Servs. Corp.*,
   920 F. Supp. 2d 90 (D.D.C. 2013) .................................................................................... 5

*Grigson v. Creative Artists Agency LLC*,
   210 F.3d 524 (5th Cir. 2000) ............................................................................................. 9

*Haymond v. Statewide Grievance Comm.*,
   45 Conn. Super. 481 (1997) ............................................................................................... 4

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Hoffman v. Deloitte & Touche, LLP*,
  143 F. Supp. 2d 995 (N.D. Ill. 2001) .................................................................................... 6

*Holzer v. Mondadori*,
  No. 12 Civ. 5234 (NRB), 2013 WL 1104269 (S.D.N.Y. Mar. 14, 2013) ................................ 4

*Innotech Sales & Eng'g, LLC v. Hostetler*,
  No. 09-10731, 2009 WL 1953040 (E.D. Mich. July 6, 2009) ................................................ 2

*Jackson v. Cintas Corp.*,
  No. 03 Civ. 3104, 2004 WL 5545444 (N.D. Ga. Sept. 29, 2004) .......................................... 5

*JLM Industries, Inc. v. Stolt-Nielsen SA*,
  387 F.3d 163 (2d Cir. 2004) .................................................................................................. 6

*Jureczki v. Banc One Texas NA*,
  252 F. Supp. 2d 368 (S.D. Tex. 2003) ................................................................................... 2

*Knapp v. New Haven Road Constr. Co.*,
  189 A.2d 386 (Conn. 1963) ................................................................................................... 9

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) ............................................................................................... 7

*Laumann v. National Hockey League*,
  Nos. 12 Civ. 1817 (SAS), 12 Civ. 3704 (SAS),
  2013 WL 6171671 (S.D.N.Y. Nov. 25, 2013) ....................................................................... 7

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
  449 F. App'x 704 (10th Cir. 2011) (unpublished) ................................................................. 7

*Lucas v. Hertz Corp.*,
  875 F. Supp. 2d 991 (N.D. Cal. 2012) ................................................................................... 5

*Murphy v. DirecTV, Inc.*,
  724 F.3d 1218 (9th Cir. 2013) ............................................................................................... 7

*Nat'l Council on Compensation Ins., Inc. v. Caro & Graifman*,
  No. 3:00–CV–1925 (AHN), 2008 WL 450413 (D. Conn. 2008) .......................................... 4

*Nitro-Lift Techs., L.L.C. v. Howard*,
  133 S. Ct. 500 (2012) ............................................................................................................ 2

## TABLE OF AUTHORITIES
(continued)

Page(s)

*O'Conner v. AT&T Corp.*,
 --- F. Supp. 2d ----, 2013 WL 3107496 (M.D. La. June 18, 2013) ........................................... 2

*Official Comm. of Unsecured Creditors of Color Title, Inc. v. Coopers & Lybrand, LLP*,
 322 F.3d 147 (2d Cir. 2003) ................................................................................................... 10

*Oral Cancer Prevention Int'l, Inc. v. Johnson & Johnson*,
 No. 3:11-cv-3878 (PGS), 2011 WL 6130599 (D.N.J. Dec. 7, 2011) ........................................ 2

*Phelps v. Baton Rouge Radiology Grp., Inc.*,
 No. 10 Civ. 865, 2011 WL 2174030 (M.D. La. June 2, 2011) ................................................. 5

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
 388 U.S. 395 (1967) ......................................................................................................... 1, 2, 3

*Ragone v. Atlantic Video at Manhattan Center*,
 595 F.3d 115 (2d Cir. 2010) ............................................................................................ 5, 6, 8

*Res. Servs., LLC v. Bridgeport Housing Auth.*,
 No. HHDCV106020108S, 2011 WL 2739544 (Conn. Super. Ct. June 13, 2011) .................... 9

*Ross v. American Express Co.*,
 547 F.3d 137 (2d Cir. 2008) ..................................................................................................... 8

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
 198 F.3d 88 (2d Cir. 1999 .......................................................................................................... 4

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
 542 F.3d 354 (2d Cir. 2008) ................................................................................................. 7, 8

*Styles v. Triple Crown Publications, LLC*,
 Civil No. WDQ-11-3759, 2013 WL 3944471 (D. Md. July 30, 2013) .................................... 2

*Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*,
 888 F.2d 239 (2d Cir. 1989) ..................................................................................................... 4

*In re Titanium Dioxide Antitrust Litig.*, --- F. Supp. 2d ----, 2013 WL 4516472 (D. Md.
 Aug. 26, 2013) .......................................................................................................................... 5

*Wallace v. Rick Case Auto, Inc.*,
 --- F. Supp. 2d ----, 2013 WL 5770996 (N.D. Ga. Oct. 23, 2013) ........................................... 5

*Wolff v. Westwood Mgmt., LLC*,
 558 F.3d 517 (D.C. Cir. 2007) .................................................................................................. 3

I.      INTRODUCTION

Christopher Graham's true grievance is with Tribal Lending Enterprise d/b/a National Payday Loan ("National PDL"), which lent him money at alleged usurious rates. But, Graham is suing BMO Harris instead. He attempts to avoid his obligation to arbitrate by (i) asserting that the alleged illegality of the contract as a whole bars enforcement of its arbitration clause; and (ii) advancing an overly narrow interpretation of equitable-estoppel and third-party beneficiary doctrines.

Both of these efforts should be rejected. Longstanding Supreme Court precedent establishes that challenges to the validity or enforceability of the contract as a whole are for the arbitrator, not the court, to decide. And Graham's proposed limitations on the equitable estoppel and third party beneficiary doctrines are inconsistent with Connecticut and Second Circuit law.

Moreover, Graham's assertion that he is not "trying to have his cake and eat it too" (Opp., Dkt. No. 157, at 18) is wrong. Every one of Graham's claims against BMO Harris rests on his allegation that the *terms* of his loan agreement—the interest rate, in particular—render the agreement illegal under Connecticut law. Thus, Graham is indeed attempting to have it both ways—to hold BMO Harris liable based on the allegedly usurious terms of his loan agreement while simultaneously attempting to evade its arbitration clause.

II.     ARGUMENT

   A.   **Graham Cannot Avoid Arbitration By Claiming That His Loan Agreement Is Illegal Or Unenforceable.**

Graham's attempt to avoid arbitration by alleging that his loan agreement is illegal is foreclosed by Supreme Court precedent. Under its longstanding *Prima Paint* "rule of severability," the Supreme Court has made clear that any "challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."

1

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006); *accord Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 503 (2012); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967).  Not only is the holding in *Buckeye Check Cashing* controlling, but the circumstances of that case, in which the plaintiffs sought to avoid arbitration by arguing that their short-term loan transactions were illegal and void *ab initio* because their lender allegedly "charged usurious interest rates" in violation of state lending and consumer protection laws (546 U.S. at 443), are also indistinguishable from the circumstances presented here.

Graham acknowledges—as he must—the clear rule set forth by the Supreme Court in *Prima Paint* and reiterated in *Buckeye Check Cashing* and *Nitro-Lift Technologies* (Opp. at 6).  But, unsupported by any authority, he urges the court to manufacture an exception to that rule when a nonsignatory seeks to compel arbitration.

That invitation should be rejected.  The rationale underlying the *Prima Paint* rule is that, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."  *Buckeye Check Cashing*, 546 U.S. at 445.  That rationale applies with equal force whether it is a signatory or a nonsignatory that invokes arbitration.  Indeed, although Graham may prefer not to acknowledge it, the fact is that courts routinely have applied the *Prima Paint* rule and compelled arbitration when, as here, a nonsignatory defendant invokes arbitration and a signatory plaintiff challenges the validity of the underlying agreement.[1]

---

[1] *See, e.g.*, *Styles v. Triple Crown Publ'ns, LLC*, Civil No. WDQ-11-3759, 2013 WL 3944471, at *4 (D. Md. July 30, 2013); *O'Conner v. AT&T Corp.*, --- F. Supp. 2d ----, 2013 WL 3107496, at *3-*4 (M.D. La. June 18, 2013); *Oral Cancer Prevention Int'l, Inc. v. Johnson & Johnson*, No. 3:11-cv-3878 (PGS), 2011 WL 6130599, at *8 (D.N.J. Dec. 7, 2011); *Innotech Sales & Eng'g, LLC v. Hostetler*, No. 09-10731, 2009 WL 1953040, at *4 (E.D. Mich. July 6, 2009); *Jureczki v. Banc One Tex. N.A.*, 252 F. Supp. 2d 368, 379 (S.D. Tex.), *aff'd*, 75 F. App'x 272 (5th Cir. 2003).

2

Graham also fails in his attempt to challenge the validity of his arbitration clause in particular. He speculates that his loan may have been conditioned on his authorization of ACH debits from his bank account (Opp. at 7), but such a claim challenges the validity of the loan transaction as a whole, not the validity of the arbitration clause in particular.[2]

Finally, and for the same reasons, Graham may not avoid arbitration by invoking the equitable doctrine of unclean hands. Because, under the *Prima Paint* rule, a court may consider only issues relating to the making and performance of the agreement to arbitrate, a plaintiff must demonstrate that the defendant's "hands are unclean with regard to the arbitration provision," not with regard "to the overall validity of the contract" or the merits of the underlying claims. *In re A2P SMS Antitrust Litig.*, --- F. Supp. 2d ----, 2013 WL 5202824, at *11-12 (S.D.N.Y. Sept. 16, 2013) (citing *Prima Paint*, 388 U.S. at 404); *see also Wolff v. Westwood Mgmt., LLC*, 558 F.3d 517, 521 (D.C. Cir. 2007) ("dismiss[ing] in short order[] [a]ppellants' unclean hands argument [because it] goes to the merits of their claims rather than their arbitrability [and] [t]here is no allegation that appellees have unclean hands with respect to the agreement to arbitrate itself"). Otherwise, the *Prima Paint* rule would be a dead letter; almost any challenge to the legality of a contract as a whole can be repackaged as an "unclean hands" argument. Graham has offered no allegations of inequitable conduct by BMO Harris that relate to his arbitration agreement; instead, he alleges only (and wrongly) that BMO Harris "collect[ed] on illegal debts and then attempt[ed] to enforce rights springing from an illegal contract" (Opp. at 34).

---

[2]   The claim is without merit in any event. Graham's loan agreement clearly states, in two separate places: "Per the Electronic Funds Transfer Act and Regulation E, this Authorization Agreement for Preauthorized ACH Debit Payment for electronic payments from your bank account is NOT a condition of obtaining this loan from TLE." Mot. to Compel, Ex. A (Dkt. No. 112-1) at 1, 6.

Moreover, Graham's position "fails on practical grounds." *In re A2P*, 2013 WL 5202824, at *13. If all a plaintiff has to do to avoid arbitration is insert unsupported and baseless allegations of inequitable conduct into his pleadings, then "no defendant could ever use equitable estoppel—or any other equitable doctrine—to enforce an arbitration agreement." *Id*. "Such a result is unsupported by logic or the law," because it "would not only run afoul of the substantial case law allowing defendants to equitably estop plaintiffs from avoiding certain arbitration clauses" (*id.*), but would also allow a signatory to unfairly evade the Federal Arbitration Act's protection of arbitration agreements.

> **B.    Graham Cannot Avoid Arbitration By Suing BMO Harris Instead Of His Lender.**
>
> **1.    Graham is equitably estopped from avoiding his agreement to arbitrate.**

As a matter of Connecticut law, BMO Harris may rely on principles of equitable estoppel to compel Graham to arbitrate his dispute (Mot. to Compel, Dkt. No. 112, at 9-15).[3] The two-

---

[3] Graham's attempt to insert a choice-of-law issue into this case (Opp. at 11-12) hurts, rather than helps, his position. To start, "the court need not conduct a choice of law analysis" because he has not shown that "'there is indeed an actual conflict between the laws of the particular jurisdictions'" that triggers a choice-of-law analysis. *Nat'l Council on Compensation Ins., Inc. v. Caro & Graifman*, No. 3:00–CV–1925 (AHN), 2008 WL 450413, at *19 (D. Conn. 2008) (quoting *Haymond v. Statewide Grievance Comm.*, 45 Conn. Super. 481, 488–89 (1997), *aff'd*, 247 Conn. 436 (1998)). Even if there were a conflict, for purposes of this motion BMO Harris has acceded to Graham's own election of Connecticut law; indeed, both his complaint and opposition to this motion rest on the assertion that Connecticut law applies to his loan agreement. Compl. ¶¶ 230-257; Opp. at 5. Courts respect such an agreement by the parties as to the governing law. *See, e.g.*, *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96 (2d Cir. 1999) ("apply[ing] the body of federal law under the FAA" to arbitration agreement because "neither party argued that [the Texas choice-of-law clause] applied"); *Holzer v. Mondadori*, No. 12 Civ. 5234 (NRB), 2013 WL 1104269, at *10 (S.D.N.Y. Mar. 14, 2013) (same for Dubai choice-of-law clause); *see also Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) ("implied consent to use a forum's law is sufficient to establish choice of law"). In any event, if Graham would prefer to be bound by tribal law, then he would be judicially estopped from opposing

part "intertwined-ness" test for application of the doctrine is satisfied here; Graham's claims arise under the subject matter of his loan agreement, and Graham is bound by his allegation that there is a sufficiently close relationship between his lender and BMO Harris.

> a. *Graham's claims are intertwined with the terms of his loan agreement.*

Contrary to Graham's protests (*e.g.*, Opp. at 13), each of his claims relies, as a *legal* predicate, on his allegation that the terms of his loan agreement violate Connecticut law (Mot. to Compel at 11-12 (citing Compl. ¶¶ 128, 134, 230-31, 241, 243, 253)). Nonetheless, Graham mistakenly contends that his claims cannot be intertwined with his loan agreement because he has not sued BMO Harris for a breach of the loan agreement or attempted to hold BMO Harris to any duty or obligation under that agreement (Opp. at 13-19). Those are not the only circumstances in which equitable estoppel applies.

The Second Circuit has on multiple occasions permitted a nonsignatory to a contract to compel arbitration of a signatory's claims under the equitable estoppel doctrine in the absence of any allegation that the nonsignatory breached the contract or any attempt by the signatory to hold the nonsignatory to an alleged contractual obligation.[4] For example, in *Ragone v. Atlantic Video*

---

dismissal of all of his claims, because the complaint asserts violations of only state and federal law and nowhere alleges that the loan was illegal under tribal law.

[4]  In fact, the case law is replete with such examples. *See, e.g.*, *Wallace v. Rick Case Auto, Inc.*, --- F. Supp. 2d ----, 2013 WL 5770996, at *5 (N.D. Ga. Oct. 23, 2013) (employment-discrimination and retaliation claims); *In re A2P SMS Antitrust Litig.*, 2013 WL 5202824, at *7-8 (violations of Sherman Act); *In re Titanium Dioxide Antitrust Litig.*, --- F. Supp. 2d ----, 2013 WL 4516472, *6-8, *11 (D. Md. Aug. 26, 2013) (violations of Sherman Act); *Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 103-04 (D.D.C. 2013) (employment-discrimination, retaliation, and unpaid-wages claims); *Lucas v. Hertz Corp.*, 875 F. Supp. 2d 991, 1003 (N.D. Cal. 2012) (strict-liability and negligence product liability claims); *In re Apple & ATTM Antitrust Litig.*, 826 F. Supp. 2d 1168, 1176-79 (N.D. Cal. 2011) (violations of Sherman Act and consumer-protection laws); *Phelps v. Baton Rouge Radiology Grp., Inc.*, No. 10 Civ. 865, 2011 WL 2174030, at *3-4 (M.D. La. June 2, 2011) (employment-discrimination claims); *Jackson v. Cintas Corp.*, No. 03 Civ. 3104, 2004 WL 5545444, at *10 (N.D. Ga. Sept. 29, 2004)

*at Manhattan Center*, 595 F.3d 115 (2d Cir. 2010), the Second Circuit held that equitable estoppel required a make-up artist to arbitrate her statutory employment-discrimination claims against ESPN, which was neither a signatory to nor mentioned in her employment contract, even though she did not allege that ESPN had breached that contract. *Id.* at 128. And in *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004), the Second Circuit held that equitable estoppel required arbitration of Sherman Act and state-law antitrust claims against a nonsignatory, even though the asserted antitrust injury was based on the "allegedly inflated price terms" contained in the relevant contracts, not on any breach of the contracts. *Id.* at 171-78. Indeed, in *JLM Industries* the Second Circuit declared that equitable estoppel may apply even if the plaintiffs' claims "in no way depend[] upon interpretation, construction, or application of any provision of the [relevant contracts]." *Id.* at 168. As another district court in this Circuit has summarized, "[c]ourts have found claims to be intertwined with an agreement containing an arbitration clause in which *the non-signatory had no obligations under that agreement*, the claims at issue did not require interpretation of the agreement, [and] the signatory's claims did not exclusively rely on the agreement." *Birmingham Assocs. Ltd. v. Abbott Labs.*, 547 F. Supp. 2d 295, 301 (S.D.N.Y. 2008) (emphasis added) (footnotes omitted), *aff'd*, 328 F. App'x 42 (2d Cir. 2009).

Moreover, none of the cases on which Graham relies involves anything akin to the situation presented here, where all of his claims against BMO Harris, the nonsignatory, require

---

(employment-discrimination and retaliation claims), *aff'd*, 425 F.3d 1313 (11th Cir. 2005); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003) (violations of Sherman Act and Truth in Lending Act); *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004-05 (N.D. Ill. 2001) (fraudulent-inducement and civil-conspiracy claims).

him to establish that the terms of his loan agreement violate Connecticut law.[5]  For example, in *Laumann v. National Hockey League*, Nos. 12 Civ. 1817 (SAS), 12 Civ. 3704 (SAS), 2013 WL 6171671 (S.D.N.Y. Nov. 25, 2013), the plaintiffs' allegations of an antitrust conspiracy among major sports leagues, regional sports networks, Comcast, and DirecTV had nothing to do with the terms found in their DirecTV subscriber agreements.  *Id.* at *6.  Similarly, in *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293 (S.D.N.Y. 2005), the relevant consulting agreements were only "collaterally related" to the plaintiffs' fraud and conspiracy claims.  *Id.* at 299.

      b. *Graham's complaint alleges a close relationship between BMO Harris and his lender.*

The language of the loan agreement contradicts Graham's assertion that he "could not possibly intuit" BMO Harris's role under the agreement (Opp. at 21).  Graham's loan agreement—in a separate document labeled "**AUTHORIZATION AGREEMENT FOR PREAUTHORIZED ACH DEBIT PAYMENT / ALTERNATIVE PAYMENT METHODS**"—set forth BMO Harris's role in processing the repayment of Graham's loan via ACH transfers.  Mot. to Compel at 12-13.  Thus, unlike in *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 362 (2d Cir. 2008), where the non-signatory's only claimed relationship to

---

[5] Accordingly, Graham's reliance on inapposite cases involving, at most, only a factual or "but-for" relationship between the plaintiff's claims and the contract containing the arbitration provision is misplaced.  Opp. at 18-19 (citing *Bailey v. ERG Enters., LP*, 705 F.3d 1311 (11th Cir. 2013) (claims based on fraudulent appraisals had only but-for relation to underlying lot purchase and mortgage agreements); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704 (10th Cir. 2011) (unpublished) (licensing agreement had only factual significance to antitrust claims for monopolization and attempted monopolization); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1132 (9th Cir.) (claims based on misrepresentations about vehicle safety were not sufficiently related to vehicle purchase agreements, because plaintiffs did not "challenge the terms" of those agreements), *cert. denied sub nom. Toyota Motor Corp. v. Choi*, 134 S. Ct. 62 (2013); *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1230 (9th Cir. 2013) (purchase agreements were "factually irrelevant" to unfair competition and other consumer protection claims based on allegations of deceit); *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392 (4th Cir. 2005) (claims based on inflated mortgage insurance premiums had only but-for relation to underlying mortgage)).

the signatory was that it allegedly induced the signatory to breach a contract, here the loan agreement itself expressly contemplated the use of the ACH network—and thus BMO Harris's services—in processing payments on the loan.  And for the same reason, *Ross v. American Express Co.*, 547 F.3d 137, 146 (2d Cir. 2008), where the nonsignatory "had no role in [the agreements'] . . . performance" and its only relation to those agreements "was as a third party allegedly attempting to subvert the[ir] integrity," does not support Graham's argument.

Graham suggests that the loan agreement was required to mention BMO Harris by name for equitable estoppel to apply.  Opp. at 23.  He is mistaken.  Indeed, in *Ragone*, the Second Circuit held that equitable estoppel allowed ESPN to invoke arbitration as a non-signatory even though it "is not mentioned in the arbitration agreement, or in any other document" constituting the underlying employment contract.  595 F.3d at 127; *see also Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 649 (S.D.N.Y. 2011) (nonsignatory defendant need not be "linked textually" to the underlying agreement in order to invoke arbitration) (quoting *Ragone*, 595 F.3d at 127).

Moreover, Graham cannot claim ignorance of BMO Harris's purported relationship with his lender because he himself has repeatedly alleged that there is a close relationship between BMO Harris and his lender.  Mot. to Compel at 13 (citing Compl. ¶¶ 73-77, 124, 127, 130, 135, 234-39, 245-49, 253).  In an effort to escape his own allegations, Graham now contends that the details of that relationship are unknown and that BMO Harris and his lender must have a specific type of corporate relationship—one where BMO Harris and his lender are "subsidiaries, affiliates, agents, or related business entities"—in order for equitable estoppel to apply (Opp. at 20, 25).  But Graham cannot avoid his own allegations (*see Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005)), nor can he, without legal support, so narrow the close-relationship test (*Sokol*, 542 F.3d at 361) to cover only a limited handful of the possible relationships that

8

may warrant application of equitable estoppel.  *See In re Apple & ATTM Antitrust Litig.*, 826 F. Supp. 2d at 1179 ("As subsequent Second Circuit cases following *Sokol Holdings* make clear, the non-signatory need not be a parent or subsidiary company of the signatory for the requisite 'relationship' to be found.")

Finally, Connecticut courts have rejected Graham's argument that conspiracy allegations alone cannot establish equitable estoppel (Opp. at 25-28).  *See Res. Servs., LLC v. Bridgeport Housing Auth.*, No. HHDCV106020108S, 2011 WL 2739544, at *7-9 (Conn. Super. Ct. June 13, 2011).  In *Resource Services*, the court found "strongly persuasive" the Fifth Circuit's view that allegations of substantially interdependent and concerted misconduct between a signatory and a non-signatory provide an independent basis for invoking equitable estoppel.  *Id.* at *7 (citing *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524 (5th Cir. 2000)).  And to the extent there is a conflict between the decisions of the Second Circuit and decisions of Connecticut state courts on this issue, the latter must prevail, because, as Graham acknowledges (Opp. at 11), whether equitable estoppel applies is a question of state law.  *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009).  In any event, Graham's contention that conspiracy allegations alone cannot justify equitable estoppel (Opp. at 25-28) is beside the point, because BMO Harris also relies on the loan agreement's express contemplation of BMO Harris's role in processing repayments of the loan and Graham's own allegations of a purported close business relationship between BMO Harris and Graham's lender.

### 2.     BMO Harris may enforce the arbitration provision as a third party beneficiary of the loan agreement.

The terms of Graham's loan agreement contradict his assertion that he never intended in the loan agreement to confer any benefit to BMO Harris, making it a third-party beneficiary (Opp. at 29-33).  As BMO Harris explained in its opening brief (Mot. to Compel at 17),

9

Graham's loan agreement expressly authorizes his lender to use the ACH network—which necessarily includes an ODFI such as BMO Harris—to process repayments on the loan.[6]  And, contrary to Graham's characterization (Opp. at 30), the arbitration provision itself expresses an intent to confer enforceable rights on BMO Harris.  The provision covers "all claims, disputes or controversies that arise out of or relate to . . . payment and collection of the loan" (Mot. to Compel, Ex. A at 5), and thus includes disputes against BMO Harris based on its acknowledged role in that portion of the transaction.  Moreover, the arbitration provision specifies that Graham must arbitrate claims not only against his lender National PDL, but also such third parties as the lender's "servicers" and "agents."[7]  *Id*.  Thus, unlike in the series of cases Graham cites (Opp. at 30-32), here both the loan agreement and the arbitration provision itself expressly confirm an intent to benefit non-signatories like BMO Harris that allegedly provided services with respect to the loan.

## III.   CONCLUSION

For all of the reasons set forth in BMO Harris's opening brief and above, BMO Harris respectfully requests that the Court grant its motion to compel arbitration and to stay the litigation against it pending that arbitration.

---

[6]   BMO Harris need not be specifically identified by name in the contract in order to enforce it.  *See Knapp v. New Haven Road Constr. Co.*, 189 A.2d 386, 389 (Conn. 1963).  The agreement need only anticipate BMO Harris's role, which, as explained above, it did.

[7]   Graham is bound by his allegations that BMO Harris purportedly was "working on behalf of" his lender (Compl. ¶ 8; *see also id*. ¶ 9 (BMO Harris allegedly was "acting on behalf of" his lender)).  *See also Official Comm. of Unsecured Creditors of Color Title, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) ("[T]he allegations in the Second Amended Complaint are judicial admissions by which [plaintiff] was bound throughout the course of the proceeding.") (alterations and internal quotation marks omitted).

Dated: February 5, 2014                    Respectfully submitted,

   /s/ A. John P. Mancini

A. John P. Mancini (No. ct04975)
MAYER BROWN LLP
1675 Broadway
New York, New York 10019-5820
Telephone: (212) 506-2295
Facsimile: (212) 262-1910
jmancini@mayerbrown.com

Lucia Nale (*Pro Hac Vice*)
Debra Bogo-Ernst (*Pro Hac Vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:   (312) 782-0600
Facsimile:   (312) 701-7711
lnale@mayerbrown.com
dernst@mayerbrown.com

Kevin Ranlett (*Pro Hac Vice*)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000 (Telephone)
(202) 263-3300 (Facsimile)
kranlett@mayerbrown.com

*Attorneys for Defendant BMO Harris Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2014, a copy of the foregoing Reply Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                                                                    */s/ A. John P. Mancini*